NO. 07-01-0328-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JUNE 7, 2002
_____

TRI-STATE CHEMICALS, INC.,

Appellant

v.

WESTERN ORGANICS, INC.,

Appellee
_____

FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;

NO. 88,953-B; HON. JOHN B. BOARD, PRESIDING
_____

Before BOYD, C.J., QUINN and REAVIS, J.J.

Tri-State Chemicals, Inc. (Tri-State) appeals from a final summary judgment denying it recovery against Western Organics, Inc. (Western). The latter had filed a traditional and "no evidence" motion for summary judgment. On appeal, the two issues raised by Tri-State involve whether the trial court erred in granting the motion. That is, Tri-State asserts that Western failed to establish its right to judgment as a matter of law since the record contained some evidence creating material issues of fact on each issue broached by Western. We reverse and remand.

### *Standard of Review*

The standards of review applicable to traditional and no evidence motions for summary judgment are well-settled. We cite the parties to *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985) and *Kimber v. Sideris*, 8 S.W.3d 672, 675 (Tex. App.--Amarillo 1999, no pet.) for a general explanation of them.

### *Background*

The foregoing standards of review require us to construe the evidence of record in a light most favorable to the party opposing summary judgment, *i.e.* Tri-State. See *Kimber v. Sideris*, 8 S.W.3d at 675-76. Doing so, we find evidence that illustrates the following.

On August 1, 1996, Tri-State and Panhandle Agri Tech, Inc. (Panhandle), through its president, Rodney Burd (Burd), entered into a written contract. Pursuant to it, Tri-State agreed to deliver products to Panhandle on consignment, and Panhandle agreed to use its best efforts to promote their sale to customers approved of by Tri-State. Within the contract were the following provisions:

2.  Consignment

. . . 'Consignment' shall have the meaning and application assigned to it by the Uniform Commercial Code as adopted in the state of Texas, and *Consignee [Panhandle] acknowledges that it does not take title to the Products, but merely holds such Products for sale on behalf of Tri-State*;

3.  Services and Responsibilities

. . . A. Consignee agrees to use its best efforts to promote sales, to solicit orders, and to apply Products when necessary, on behalf of Tri-State, *to approved accounts of Tri-State* . . . .

2

4.      Payment for Products

Billing for Products is to be performed by Tri-State; however, all payments received by Consignee [Panhandle] upon delivery of Tri-State Products or payments received on accounts, shall be and remain absolute property of Tri-State and shall be kept separate and apart from the property and account of Consignee [Panhandle].  All payments for Tri-State Products shall be remitted directly to Tri-State.

6.      Security Filing and Notice

A.     Tri-State may request , and Consignee [Panhandle] agrees to comply fulling with such request, a UCC Article 9 filing on all Tri-States's Products placed in Consignee's facilities in order to notify Consignee's creditors or other interested persons that Tri-State *owns and has title to the Products* at Consignee's warehouse.  Consignee [Panhandle] further agrees to place a sign or signs in a conspicuous position near the Products that states: 'THESE PRODUCTS ARE THE SOLE PROPERTY OF TRI-STATE.' Consignee agrees to execute a security agreement and form UCC - 1 as appropriate . . .  covering all consigned Products and for Products delivered to Consignee but for which payment has not been made.  Consignee [Panhandle] expressly covenants to maintain the Products free and clear of any and all liens and encumbrances, to segregate the Products in its storage facilities, and to *designate the Products as being owned by Tri-State.*

B.     Consignee [Panhandle] agree and acknowledges that no creditor of Consignee shall have any right to or interest in the Products or the proceeds thereof.

(Emphasis added).

After Tri-State began delivering its products to Panhandle, Burd deposited receivables and proceeds from the sale of the consigned goods into a general operating account of Panhandle.  That account also contained funds generated from sources other than the sale of Tri-State products.  Monies were then taken from the account to buy various assets for Panhandle's use.

Eventually, Burd, his wife, and Western entered into an "Agreement for the Sale of Business Assets," dated May 11, 1998.  Thereunder, Western agreed to buy the realty

3

upon which Panhandle conducted its business and "all office equipment, furniture, office supplies and inside and outside operating equipment used by Panhandle in its business," including several motor vehicles of Panhandle. In exchange for obtaining the assets, Western issued to Burd 54,310 shares of Western stock (valued at $2.32 a share) and assumed the payment of various Panhandle debt approximating $66,409.00. Furthermore, among the assets acquired by Western were some bought by Panhandle with proceeds from the sale of Tri-State's consigned products.

Because Panhandle failed to pay Tri-State for all the products consigned to and sold by Panhandle, Tri-State sued the company. Eventually, Western was joined in the suit via an amended petition. The causes of action asserted against Western sounded in assumpsit and money had and received. Regarding the former, Tri-State alleged, among other things, that Western 1) "unjustly retained benefits to the loss of" Tri-State, 2) "acquired real and personal property, equipment and furniture, by unjustly retaining benefits belonging to" Tri-State, and 3) "sold restricted corporate stock to Burd and received in exchange money that belonged to" Tri-State. Therefore, it requested that the trial court "order that . . . Western return the assets unjustly retained or pay a sum of money such that [Tri-State] will be compensated for its loss . . . ." Regarding the second cause of action, the company alleged that Western and others "in an unlawful and unauthorized manner, in derogation of [Tri-State's] rights, had and received $375,413.19, representing proceeds from the sale of [Tri-State's] consigned products which legally belonged to [Tri-State], which in equity and good conscience should be returned to" it. And, because Western refused to return the "money had and received," it and the other defendants "are jointly and severally liable to [Tri-State] for . . . $375,431.19 . . . ."

4

Once issue was joined, Western moved for summary judgment. It believed itself entitled to judgment because 1) Tri-State could not "establish an ownership or security interest in any property purchased by Western . . . from Panhandle or Burd," 2) any security interest that Tri-State could establish was "subordinate to Western's . . . interest in the property sold by Panhandle. . . ," 3) Tri-State could not "establish that Western . . . received any 'money' from Panhandle or Burd . . . ," 4) Tri-State could not "establish that Western . . . holds money which belongs to" it, 5) Tri-State could not "establish any privity or quasi-contractual relationship between Western . . . " and it, 6) Tri-State could not "establish that Western . . . was unjustly enriched to the detriment of" it, 7) there was no evidence that Tri-State had an "ownership or security interest in any property" acquired by Western, 8) there is no evidence that any security interest of Tri-State was superior to the ownership interests of Western in the property, and 9) there was no evidence that Tri-State received "money" from Panhandle or Burd, held "money" belonging to Tri-State, or enjoyed privity with Western *viz* any Tri-State funds acquired by Western. Prior to granting the motion, the trial court sent the parties a letter evincing its intent to do so. Therein, it stated that it "find['s] that Plaintiff's reliance on 'money had and received' is misplaced." "Since there is no 'money' or an equivalent thereto involved, there is, as a matter of law, no cause of action," ruled the trial court. However, the summary judgment it subsequently issued said nothing about the specific ground upon which it acted.

5

### *Discussion*

*1.     Evidence of Tri-State's "Money" in the Possession of Western*

Though not the first ground alleged in the motion for summary judgment, the question of whether Western received any monies of Tri-State was of import to the trial court. So, we address it first. And, upon doing so, we conclude that the grounds implicating that topic did not establish Western's right to judgment as a matter of law.

Two causes of action were asserted against Western. One involved the general claim of assumpsit and the other, money had and received. According to legal historians, assumpsit was developed to redress circumstances involving unjust enrichment or to "prevent a man from retaining the money of, or some benefit derived from, another which it is against conscience that he should keep." 1 CHITTY ON CONTRACTS Ch. 29, p. 843-44 (24th ed. 1977).[1] Furthermore, it encompassed an obligation imposed by law on one to pay a sum of money or to deliver specific property to another. *Id.* In time, assumpsit was divided into various categories. Some of them were known as indebitatus assumpsit, quantum meruit, quantum valebant, and insimul computassent. 64 TEX. JUR. 3D *Restitution* §2 (1989).

The chose-in-action for money had and received fell within the scope of indebitatus assumpsit, 1 CHITTY ON CONTRACTS Ch. 29, p. 845-46, and encompassed claims for the return of money. *See Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951) (stating that all a plaintiff need show to recover under a claim of money had and received "is that the

---

[1]The common law theory of assumpsit apparently had and has a sister in equity. Like assumpsit, the equitable principles also evolved from the desire to remedy unjust enrichment. 1 CHITTY ON CONTRACTS Ch. 29, p. 844-45 (24th ed. 1977). However, both the common law and equitable theories are now categorized under the general label of restitution, though each had distinct components and limitations. *Id.*

6

defendant holds money which in equity and good conscience belongs to" the plaintiff); *Miller-Rogaska, Inc. v. Bank One, N.A.*, 931 S.W.2d 655, 662 (Tex. App.--Dallas 1996, no writ) (stating the same); *Gray v. Laketon Wheat Growers, Inc.*, 240 S.W.2d 353, 356 (Tex. Civ. App.--Amarillo 1951, no writ) (stating the same). Additionally, the concept of "money" for purposes of the claim has come to mean more than mere coins or dollar bills. For instances, various jurisdictions, and at least one Texas intermediate court of appeals, have indicated that the "equivalent" of money, *Gonzales Motor Co. v. Buhidar*, 348 S.W.2d 376, 378 (Tex. Civ. App.--Eastland 1961, writ ref'd n.r.e.); *Hartman v. Townsend*, 523 N.E.2d 199, 202-03 (Ill. App. Ct. 2d Dist. 1988); *Gottfried v. Gottfried*, 56 N.Y.S.2d 50, 56 (N. Y. App. Div. 1945), property received as money, *Koller v. Shannon County Bank*, 74 S.W.2d 271, 274 (Mo. Ct. App. 1934) (promissory notes), or property converted into money before suit, *United States Nat'l Bank v. Miller*, 703 P.2d 246, 250 (Or. Ct. App. 1985) (realty unjustly obtained and then sold for cash) may also be recovered via the cause of action.

Yet, overtime, the monikers appended to the old common law causes of action have fallen by the wayside, as have the "the procedural niceties" related to them. *McNair v. Cedar Park*, 993 F.2d 1217, 1220 (5th Cir. 1993). Instead, jurists now focus upon the facts alleged and recovery sought and thereby categorize the action as one for money had and received or restitution. *Id.* In other words, since their inception, old common law causes of action have mutated, as have their names and procedural technicalities. No longer do we place much emphasis on the word assumpsit but on the purpose that concept served. *Id.* As stated in *McNair*, the facts involved and the relief requested are determinative as opposed to the label by which the claim is called. Simply put, the

7

substance of what is pled controls, not the label or name appended to the claim. And, that is of import here.

While one claim of Tri-State focuses on the recovery of monies had and received, the other focuses upon the recapture of its assets "unjustly retained" by Western. Additionally, Western was "unjustly retaining benefits belonging" to Tri-State because the benefits and assets alluded to were acquired by Western "with Plaintiff's money wrongfully obtained by Burd while acting in his capacity as an officer of Panhandle." So, irrespective of the name appended to the second claim, Tri-State effectively seeks the recovery of its property wrongfully taken or stolen by Panhandle, converted into another form, and then transferred to Western. And, Texas jurisprudence has long permitted a true owner of personalty to do so. *McKinney v. Croan*, 188 S.W.2d 144, 146 (Tex. 1945) (holding that "one in rightful possession of personal property may maintain an action for its recovery against a thief or one holding under him"); *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d 290, 295 (Tex. Civ. App.--Galveston 1954, writ ref'd n.r.e.) (recognizing the "general rule" to be "that the owner of stolen property can recover it or its value from anyone who has received it and exercised dominion over it"). Moreover, that the ultimate recipient may have acquired the personalty in good faith matters not for the true owner may still recover it. *See Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d at 295 (stating that the one who receives money, *as opposed to other personalty*, in good faith and for valuable consideration can keep it without liability to him from whom it was stolen). This is so because, as to personalty other than money, a thief cannot pass good title.

8

*McKinney v. Croan*, 188 S.W.2d at 146 (stating that a purchaser of property from one who has obtained it by theft acquires no title to it).

Finally, the principles enunciated in *McKinney* and *Sinclair* are nothing more than the reiteration of established rules pertaining to assumpsit and restitution.[2]   So, even though modern jurists may be shying away from the use of archaic terms and "procedural niceties," one may still invoke historical concepts of assumpsit to recover their personalty from those who obtained it wrongfully, irrespective of whether the personalty is money or chattel.  So, any contention that Western was entitled to summary judgment simply because it neither received nor held "money" of Tri-State is incorrect.  Tri-State may still pursue the recovery of its assets, whether monetary or otherwise, which fell into the hands of third-parties through wrongful means.

   2.     *No Ownership or Security Interest in Any Property*

We next address the various grounds pertaining to Tri-State's ability to illustrate an ownership or security interest in property obtained by Western from Panhandle. According to Western, the existence of any such interests could not be illustrated, and this entitled it to summary judgment.  We disagree.

   a.     *Ownership Interest*

Western initially questions the existence of Tri-State's ownership interest in any of the property it acquired because "Tri-State cites no authority for its contention that if it owned the cash, it now owns the equipment . . . purchased . . . with the cash." Moreover,

---

[2]Long ago, it was recognized that either a claim of restitution *or assumpsit* was available to one attempting to recoup property stolen from him and sold to innocent third-parties. *Restatement of Restitution, Quasi-Contracts, & Constructive Trusts* §128 cmt c, illus. 3, 4, 5, & 6 (1937).

"[t]his contention is unsupported in the law," Western concludes. The argument is of no consequence. This is so because the owner of personalty wrongfully taken from him may recoup it, or the proceeds or mutations thereof, from the possession of one who took it, *Meadows v. Bierschwale*, 516 S.W.2d 125, 129 (Tex. 1974), *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d 849, 852-53 (Tex. Civ. App.–Amarillo 1979, no writ), or his transferee. *Austin Lakes Estates, Inc. v. Meyer*, 557 S.W.2d 380, 382 (Tex. Civ. App.--Austin 1977, no writ). Moreover, this remedy exists irrespective of technical legal principles regarding title and ownership. *Southwest Livestock & Trucking Co. v. Dooley*, 884 S.W.2d 805, 810 (Tex. App.--San Antonio 1994, writ denied); *Peirce v. Sheldon Petroleum Co.,* 589 S.W.2d at 853. All that the claimant need do is illustrate that his property can be traced directly into the asset he seeks. *Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d at 853.[3] So, at the very least, the owner of stolen property has an interest in the proceeds from that property sufficient to enable him to recoup those proceeds from their possessor. And, given that, any argument to the contrary would not warrant summary judgment.

*a. Security Interest*

Next, Western contended that by virtue of sections 9.109, 9.301 and 9.306 of the Texas Business and Commerce Code, it took the chattel at issue free of any security interest that Tri-State may have had in the property.[4] These arguments would be of import

---

[3]Tri-State cites us to the deposition testimony of Burd wherein the latter states that funds belonging to Tri-State were used to buy various assets subsequently transferred to Western. Thus, at the very least, there existed a material issue of fact regarding Tri-State's ability to trace its alleged property into the hands of Western.

[4]Since the provisions of the Business and Commerce Code relied upon by Western were those in existence prior to the legislative changes of 1999, we too restrict our analysis to those provisions. Whether the amendments would apply to the dispute at bar or whether they would warrant a different result are questions not before us at this time.

if the relationship between Tri-State and Panhandle *viz* the consigned goods is one of buyer, seller, and security interest holder. This is so because article 9 of the Commercial Code applies to transactions "intended to create a security interest" in personalty. TEX. BUS. & COM. CODE ANN. §9.102(a)(1) (Vernon 1994). And, if the parties merely intended that the consignment be nothing more than a secured transaction, then, Tri-State would be obligated to comply with the provisions of article 9. 4 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE §30-4 (4th ed. 1995); *see* TEX. BUS. & COM. CODE ANN. §1.201(37)(A) (Vernon 1994) (stating whether a consignment is merely a security agreement depends upon the intent of the parties). Next, to determine that intent at bar, we must look at the contract executed by Tri-State and Panhandle. *See Hudson Buick, Pontiac, GMC Truck Co. v. Gooch*, 7 S.W.3d 191, 198 (Tex. App.--Tyler 1999, pet. denied) (stating that the intent of the parties is to be garnered from the contract executed by them).

Through that contract, Tri-State and Panhandle agreed that title to the consigned goods was to remain in Tri-State. So too did they agree that proceeds from the sale of the goods were to be segregated from Panhandle's funds, that the consigned goods would be segregated from others possessed by Panhandle, that the latter would notify third-parties that the segregated items were the "*sole property* of Tri-State" and "*owned by* Tri-State," that a "UCC Article 9 filing" may be completed to notify Panhandle's "creditors or other interested persons that Tri-State *own[ed] and [had] title* to the Products," that no creditor of Panhandle would have any right or interest in the products, that the risk of loss regarding the consigned goods would rest with Tri-State (save for loss caused by Panhandle's own negligence or willful misconduct), that sales were to be made only to customers approved

11

by Tri-State, that the remuneration Panhandle was to receive consisted of a "monthly commission," that account receivables and inventory were to "be funded by Tri-State at no cost to" Panhandle, that Tri-State (as opposed to Panhandle) was to bill customers for the products they bought, and that Panhandle would keep the products free from all liens and encumbrances. (Emphasis added). These contractual provisions hardly evince an intent on the part of either Tri-State or Panhandle to simply vest Tri-State with "an interest in personal property or fixtures which secures payment or performance of an obligation." TEX. BUS. & COM. CODE ANN. §1.201(37)(A) (Vernon 1994)(so defining a security interest). Rather, they illustrate that Panhandle was acting as an agent for Tri-State, that the latter was to retain ownership of the products, and that the arrangement was a true consignment. *See General Elec. Credit Corp. v. Strickland Div. Of Rebel Lumber Co.*, 437 So. 2d 1240, 1245 (Ala 1983) (holding that the transaction involved a true consignment, as opposed to a security interest, because the consignee was remunerated on a commission basis and had no obligation to pay for unsold buildings). So, because the contract between Panhandle and Tri-State did not evince the creation of a mere security agreement, the rules applicable to such agreements and their priorities found in article 9 have no application to the dispute at bar. *Id*. at 1244; 4 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE §30-4 (stating that if the court determines that the consignment is actually a security agreement, then the consignor must protect his interest via compliance with article 9 but if it is not a security agreement, then the consignor protects his interest via compliance with §2.326(c)(a) or (b)).

12

*b. Title of Consigned Goods Passed to Western*

Next, Western posited that Tri-State lacked any interest in the property purchased from the proceeds of the sale of the consigned goods because title to the consigned goods vested in Panhandle. It based the contention upon §2.326(c) of the Texas Business and Commerce Code. Prior to its 1999 amendment by the Texas legislature, the section stated, in pertinent part, that:

> Where goods are delivered to a person for sale and such person maintains a place of business at which he deals in goods of the kind involved, under a name other than the name of the person making delivery, then *with respect to claims of creditors of the person conducting the business* the goods aredeemed to be sale or return . . . .

TEX. BUS. & COM. CODE ANN. §2.326(c) (Vernon 1994) (emphasis added). This provision was enacted to clarify the nature of a consignment with respect to claims of creditors of the consignee. *Id.* at comment 2. "As against such creditors words [like] 'on consignment' or 'on memorandum' with or without words of reservation of title in the seller, are disregarded when the buyer has a place of business at which he deals in goods of the kind involved." *Id.* Admittedly, there are exceptions to the rule; yet, it is obvious that before the rule can come into play a creditor must intervene. *Fuller v. Texas Western Fin. Corp.*, 644 S.W.2d 442, 443 (Tex. 1982); *Brashear v. D Cross B, Inc.*, 711 S.W.2d 749, 750 (Tex. App.--Fort Worth 1986, writ ref'd n.r.e.) (stating that the agreement of a consignor and consignee is not effective against a *creditor*). In other words, creditors of the consignee enjoy the protection afforded by §2.326(c), not the original parties of the consignment or their assignees. *Brashear v. D Cross B, Inc.*, 711 S.W.2d at 750-51. And, this is of import because, at the very least, there appears to be a material question of fact regarding

13

whether Western was an assignee (purchaser) of Panhandle's chattel and realty or a creditor of the consignee. Again, Western took the property at issue via an agreement to purchase a substantial portion of the assets utilized by Panhandle in its business. A transaction of that ilk likens more to an assignment or conveyance of a business rather than to a credit transaction. *See Luecke v. Wallace*, 951 S.W.2d 267, 273 (Tex. App.–Austin 1997, no writ) (stating that the word "'assigns' includes those individuals who take property 'either immediately or remotely from or under the assignor, whether by conveyance, devise, descent, or act of law.'").[5] And, Western likens more to one buying a business and its assets than to a creditor.[6] So, it cannot be said, as a matter of law, that §2.326(c) of the Business and Commerce Code somehow insulated the property bought by Western from the claims of Tri-State for Western may not be a "creditor" as contemplated by the statute.

### 3. Inability to Trace

Western next contends that it was entitled to summary judgment because none of the stolen assets of Tri-State could be traced into its hands. In so arguing, however, it does not address the deposition testimony of Burd. This is of import since Burd, Panhandle's president at the time, stated under oath that proceeds from the sale of the consigned goods were used to acquire specific chattel which he identified and which was subsequently transferred to Western. Furthermore, the chattel purchased with those

---

[5]Indeed, though Western invokes §2.326(c), it neither argued nor attempted to illustrate that it was a creditor of Panhandle.

[6]According to the Texas Business and Commerce Code, a creditor includes a general, secured, or lien creditor or their representatives. TEX. BUS. & COM. CODE ANN. §1.201(12) (Vernon 1994). The term also connotes one to whom money, a debt or a claim is owed. BLACK'S LAW DICTIONARY 368-69 (6th ed. 1990).

14

proceeds included office equipment and at least one motor vehicle.  It may well be that a fact-finder would discredit the testimony.  Yet, that does not matter when the setting is one of summary judgment for there the trial court cannot make credibility determinations.  *Johnston v. American Med. Int'l*, 36 S.W.3d 572, 575 (Tex. App.--Tyler 2000, no pet.).  So to the extent that some evidence of record illustrated that proceeds from the consigned products could be traced into the hands of Western, the contention that no such property could be so traced did not warrant summary judgment.  *See Peirce v. Sheldon Petroleum Co.*, 589 S.W.2d at 853 (stating that when the beneficiary can point to the specific property that was purchased or its mutation the tracing burden was met).

### 4.    Lack of Privity

Next, Western contended that summary judgment was warranted because no privity existed between it and Tri-State.  Same is required before one can use the theory of money had and received to recoup property from another, according to Western.  We disagree.

Assuming *arguendo* that privity is an element of Tri-State's causes of action,[7] the law implies the requisite privity when the stolen property is found in the hands of the defendant.  *Webster v. Sterling Fin. Co.*, 173 S.W.2d 928, 931 (Mo. 1943); *see Friar v. Vanguard Holding Corp.*, 434 N.Y.S.2d 698, 702 (App. Div. 1980) (stating that no privity of contract is required except that which results from the circumstances of the case and whether the defendant's original possession of the money is rightful or wrongful is

---

[7]At least one commentator suggests that "the notion of 'privity' is unnecessary" since the cause of action involves a promise implied by law as opposed to one arising by consent.  1 CHITTY ON CONTRACTS Ch. 29, p. 851 (24th ed. 1977).

immaterial). It is undoubtedly for this reason that authority permits the recovery of stolen property or its proceeds from those who originally took it *and their transferees*, *Austin Lakes Estates, Inc. v. Meyer*, 557 S.W.2d at 382, *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d at 295 (stating that the property can be recovered from "anyone who has received it"), even if the transferee is a good faith purchaser for value. *Sinclair Houston Fed. Credit Union v. Hendricks*, 268 S.W.2d at 295; *Restatement of Restitution, Quasi Contracts & Constructive Trusts* §128 cmt c, Illus. 3 & 4, cmt f; *McKinney v. Croan*, 188 S.W.2d at 146 (holding that the owner of the stolen car could recover it from the individual who bought it for "valuable consideration" from the thief). Here, again, the record contains evidence of theft of monies, conversion of the stolen funds into specific chattel, and the delivery of that chattel to Western. Thus, some evidence appeared of record from which a fact-finder could infer privity as contemplated by the *Restatement of Restitution*, *McKinney*, *Sinclair*, *Austin Lakes*, *Friar*, and *Webster.*

### 5. No Unjust Enrichment

Western next argued that it was entitled to summary judgment because it was not unjustly enriched. Furthermore, it purportedly was not unjustly enriched because it gave value for what it received. We disagree.

Simply put, the unjust enrichment for purposes of restitution and assumpsit comes by way of receiving that which actually belongs to another. It does not matter that the ultimate recipient paid value for the chattel as illustrated in *McKinney*, *Sinclair*, and the *Restatement of Restitution*.

16

*6.    No Evidence*

Finally, Western argued that it was entitled to summary judgment because Tri-State had no evidence to establish various elements of its claims.  The elements mentioned happened to be those which we addressed above.  And, in addressing them above, we illustrated that they were either not aspects of Tri-State's causes of action or that the record contained some evidence upon which a jury could reasonably infer that they existed.  Thus, the trial court was not authorized to grant summary judgment upon Western's claims of no evidence.

For the reasons stated above, we reverse the summary judgment and remand the cause for further proceedings.


Brian Quinn
Justice


Publish.