**Affirmed and Opinion Filed August 2, 2022**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-20-01115-CV**
_____

**MINGTEL INC. D/B/A AZPEN INNOVATION, Appellant**

**V.**

**COMERICA BANK, Appellee**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-19-11481**

# MEMORANDUM OPINION

Before Justices Myers, Osborne, and Nowell
Opinion by Justice Osborne

After a bench trial, the trial court rendered judgment for appellee Comerica Bank on appellant Mingtel Inc. d/b/a Azpen Innovation's claim for money had and received. In one issue, Mingtel contends the trial court erred because Mingtel's interest in the proceeds from the sale of certain consigned goods was superior to Comerica's. We conclude that under Article 9 of the Uniform Commercial Code, Comerica's perfected security interest in the proceeds was superior to Mingtel's unperfected consignor's interest. Accordingly, we affirm the trial court's judgment.

BACKGROUND

Mingtel manufactures computer tablets for resale by consumer retailers. Some of Mingtel's products were sold on the Home Shopping Network under HSN's "Master Terms and Conditions for Drop Shipment Vendors" ("MTC") agreement that Mingtel signed in 2013. HSN required Mingtel to use an approved third party to fulfill the orders made on HSN and ship the products to consumers. Mingtel contracted with PCT Brands[1] for this purpose, entering into a "Fulfillment Services Agreement" ("FSA") in 2014.

Neither the MTC nor the FSA provided that title to the goods would pass to PCT. The MTC agreement provided that "[t]itle to each item sold by HSN will pass from [Mingtel] to HSN upon HSN's receipt of the Shipping Confirmation to the applicable customer." The FSA provided that "Title to and ownership of all Products in PCT's possession shall remain in [Mingtel] at all times until such title passes directly to HSN's customers and shall not pass to PCT at any time."

Under the two agreements, HSN agreed to pay Mingtel for the products shipped by PCT, and Mingtel in turn agreed to pay a fee to PCT for each product shipped. In practice, however, HSN sent payment for the goods to PCT, not to Mingtel. Mingtel's chief executive officer, Jim Hu, testified that this was because the MTC agreement required all communications with HSN, including electronic

---

[1] Although the FSA admitted into evidence at trial reflected the contracting party as "PT Treasures, Inc.," Mingtel originally named "PCT Brands, LLC" as a party in this lawsuit. The record does not reflect any issue, pertinent to this appeal or otherwise, about this discrepancy.

payments, to be in an approved electronic data format. As part of its services under the FSA, PCT provided an electronic data interface for communications to and from Mingtel in a format acceptable to HSN.

It is undisputed that Mingtel did not perfect a security interest in any accounts from HSN or PCT.

Also in 2014, PCT borrowed money from Comerica Bank. PCT executed a security agreement on November 21, 2014, granting Comerica a continuing security interest and lien on PCT's assets to secure payment of the loan. Some years later, PCT defaulted on the loan and entered into a series of forbearance agreements with the bank. Under these agreements, PCT surrendered all of its cash inflows to Comerica, including a cash collateral account that Comerica maintained and controlled.

At issue in this case are 3,000 units of Mingtel's products sold on HSN in June 2017. Mingtel alleged the gross revenue from the sale was $357,750. PCT shipped the orders and HSN paid PCT in two payments. PCT never paid Mingtel, stopping payment on one check for $150,000 and failing to make any other payments. Instead, HSN's funds were deposited into PCT's cash collateral account at Comerica Bank and applied to repayment of Comerica's loans to PCT.

Mingtel filed suit against Comerica and PCT in 2019 asserting multiple causes of action. Comerica moved for summary judgment after Mingtel nonsuited its claims against PCT, but its motion did not include Mingtel's claim for money had and

received. The trial court granted Comerica's motion and proceeded to a bench trial on Mingtel's remaining claim. After hearing evidence and argument, the trial court rendered judgment for Comerica, ordering that Mingtel take nothing on its claim. The trial court denied Mingtel's motion for new trial or for reconsideration. This appeal followed.

## ISSUE AND STANDARD OF REVIEW

In its sole issue, Mingtel contends the trial court erred by ruling in favor of Comerica on Mingtel's claim for money had and received. This is a claim for equitable relief. *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 836 (Tex. App.—Dallas 2008, pet. denied). A trial court exercises broad discretion in balancing the equities involved in a case seeking equitable relief. *Id.* In reviewing a trial court's ruling on a claim for equitable relief, "we first determine whether the evidence is sufficient to support the challenged findings and then determine whether the trial court's judgment—as a decision of a claim seeking equitable relief—is arbitrary, unreasonable, or unsupported by guiding rules and principles." *Id.* at 836.

The trial court did not make findings of fact and conclusions of law. Consequently, we imply all findings necessary to support the judgment, provided the necessary findings are raised by the pleadings and supported by the evidence. *Hazzani, LLC v. Richardson Bus. Ctr., Ltd.*, No. 05-18-00346-CV, 2019 WL 3244175, at *4 (Tex. App.—Dallas July 19, 2019, no pet.) (mem. op.). When, as here, the record on appeal contains the reporter's record, the trial court's implied

findings may be challenged for legal and factual sufficiency under the same standards that govern challenges to a jury's findings. *Id.* That is,

> we must determine whether the evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. Anything more than a scintilla of evidence is legally sufficient to support a challenged finding. When we review a finding for factual sufficiency, we consider all of the evidence and will set aside a finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

*Edwards*, 252 S.W.3d at 836 (citations omitted).

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and the evidence. *Shaw v. County of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). The trial court may believe one witness and disbelieve others and may resolve any inconsistencies in a witness's testimony. *Id.*

**DISCUSSION**

Although Mingtel's claim was for money had and received, Mingtel explains that "[t]he present case depends less on the elements of money had and received (as neither party has denied the fact that the HSN checks were deposited into PCT's cash collateral account), but instead, hinges on whether the consignment between Mingtel and PCT was a 'true consignment' or one governed by Article 9 of the UCC." Mingtel contends that "[t]his is important because under common law, the consignee's [PCT's] rights in the consigned goods are limited and its creditors [e.g., Comerica] cannot assert claims against those goods." Mingtel argues that if Article 9 does not apply, "[t]he funds sent by HSN to PCT were . . . never the 'cashflow' of

–5–

PCT in which Comerica had a security interest."[2] But if Article 9 applies, as Comerica contends, then Comerica's perfected security interest has priority over Mingtel's unperfected interest. Accordingly, we first discuss the parties' arguments under Article 9 before considering Mingtel's claim for equitable relief.

## 1. UCC Article 9

UCC section 9.103(d) provides that "[t]he security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory." TEX. BUS. & COM. CODE § 9.103(d). Accordingly, the perfection and priority rules concerning competing security interests apply to consigned goods. *Id.* § 9.109(a)(4) (Article 9 applies to consignments); *id.* cmt. 6 ("This Article applies to every 'consignment'" and includes "many but not all 'true' consignments (i.e., bailments for the purpose of sale")). With certain exceptions not applicable here, a financing statement must be filed to perfect all security interests. *Id.* § 9.310(a).

UCC section 9.319 sets forth when Article 9, rather than "law other than this chapter," applies to determine a consignee's rights with respect to its creditors:

> § 9.319. Rights and Title of Consignee with Respect to Creditors and Purchasers
>
> (a) Except as otherwise provided in Subsection (b), for purposes of determining the rights of creditors of, and purchasers for value of goods from, a consignee, while the goods are in the possession of the

---

[2] Mingtel concludes that because "PCT was only entitled to a service fee of $3.00 per unit sold by HSN, which totaled $9,750.00 from the June sale[,]" "only $9,750.00 can be considered PCT 'cashflow' and subject to seizure" by Comerica.

consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer.

(b) For purposes of determining the rights of a creditor of a consignee, law other than this chapter determines the rights and title of a consignee while goods are in the consignee's possession if, under this subchapter, a perfected security interest held by the consignor would have priority over the rights of the creditor.

TEX. BUS. & COM. CODE § 9.319.[3]

If a consignee's creditor has perfected its security interest but the consignor has not, the creditor's interest has priority, as explained in a comment to section 9.319:

Example 1: SP-1 delivers goods to Debtor in a transaction constituting a "consignment" as defined in Section 9-102. SP-1 does not file a financing statement. Debtor then grants a security interest in the goods to SP-2. SP-2 files a proper financing statement. Assuming Debtor is a mere bailee, as in a "true" consignment, Debtor would not have any rights in the collateral (beyond those of a bailee) so as to permit SP-2's security interest to attach to any greater rights. Nevertheless, under this section, for purposes of determining the rights of Debtor's creditors, Debtor is deemed to acquire SP-1's rights. Accordingly, SP-2's security interest attaches, is perfected by the filing, and, under Section 9-322, is senior to SP-1's interest.

TEX. BUS. & COM. CODE § 9.319 cmt. 2.

The parties disagree whether Article 9 of the UCC applies to Mingtel's claim. Mingtel argues that Article 9 does not apply, and under common law, its interest as consignor and owner of the goods prevails over Comerica's interests as a creditor of

---

[3] *See also* TEX. BUS. & COM. CODE § 9.103(d) (providing that "[t]he security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory"); *id.* § 1.201(b)(35) defining "security interest" to include "any interest of a consignor . . . in a transaction that is subject to Chapter 9").

PCT. Comerica argues that Article 9 applies, and under section 9.319, its perfected security interest in PCT's accounts prevailed over Mingtel's unperfected consignor's interest.

The UCC defines "consignment" in section 9.102(a)(20):

(20) "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:

    (A)   the merchant:

        (i)   deals in goods of that kind under a name other than the name of the person making delivery;

        (ii)   is not an auctioneer; and

        (iii)   is not generally known by its creditors to be substantially engaged in selling the goods of others;

    (B)   with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;

    (C)   the goods are not consumer goods immediately before delivery; [and]

    (D)   the transaction does not create a security interest that secures an obligation . . . .

TEX. BUS. & COM. CODE § 9.102(a)(20).

Mingtel argues that under subsection 9.102(a)(20)(A)(iii), the evidence showed that Comerica was "generally aware of PCT's business ventures." Consequently, Article 9 did not apply, and Mingtel was not required to file a financing statement to protect its interests. Comerica counters that PCT was not "substantially engaged in selling the goods of others."

Mingtel relies on the testimony of Patrick Michael O'Keefe,[4] a financial consultant hired by PCT, that "Comerica was intimately involved with issues of [PCT's] cash flow" in 2016. O'Keefe testified that "we would have a lot of detail as to who was to be paid and why." In response to the question whether Mingtel was "the only vendor of this nature that PCT was working with, at least with HSN during the time you were there," O'Keefe responded, "No. There were several." O'Keefe also testified that "the business of PCT Brands" was that "[t]hey essentially sold products primarily manufactured in China through two main channels, QVC and HSN, so Home Shopping Network types of businesses."

Comerica responds that O'Keefe was PCT's consultant, not Comerica's, so his knowledge was not attributable to Comerica. In any event, O'Keefe testified that he had "no recollection of the arrangement between Mingtel and HSN," and that drop ship services "were not a big part" of PCT's business. Comerica also argues that, according to O'Keefe, PCT owned inventory purchased from third parties that it would resell to its customers, in contrast to the consignment arrangement between PCT and Mingtel.

---

[4] Portions of O'Keefe's deposition designated by each party were admitted into evidence at trial. O'Keefe testified that he is the chief executive officer and managing member of O'Keefe and Associates Consulting, LLC. PCT retained O'Keefe and Associates as a "turnaround consultant" in 2016, when "it was apparent that there were some things that were broke with [PCT's] business model and that they were going to be in default or already [were] in default with Comerica Bank, their lender." O'Keefe explained that "turnaround consulting" includes "services provided to help the business turn around to profitability. Typically we are brought in in situations where the company is losing money or is nonperforming."

Mingtel also relies on the FSA's specific provisions revealing that PCT was an approved drop ship vendor for HSN:

- "PCT is engaged in the business of, among other things, distributing consumer electronics devices and digital products to retail sales channels, including television-based retailers, for resale."

- "PCT is also an authorized Drop Shipment Vendor partner of HSN, Inc. [Mingtel] is in the business of, among other things, manufacturing a line of digital cameras (the "Products") for retail sale, including to HSN. [Mingtel] desires to engage PCT, and PCT is willing to accept such engagement, to assist [Mingtel] in warehousing the Products and fulfilling orders from HSN for the Products, all on the terms and conditions set forth herein."

As Comerica argues, however, there is no evidence that Comerica was aware of the FSA or its terms. Barbara Utterback, a special assets groups officer for Comerica, testified that the FSA was not contained in Comerica's files for PCT, and Hu testified that Comerica did not know about the FSA.

Mingtel also cites Utterback's testimony that when a company requests a line of credit, the bank "takes a look" at matters including "information on what the business actually does." In response, Comerica cites Utterback's testimony that PCT was in the business of selling "software bundling" and "providing warranty IT support for products sold through other distributors such as HSN . . . that couldn't provide IT support." Utterback added that PCT "was also selling phone accessories such as bluetooth speakers." Comerica concludes that "Mingtel did not introduce any evidence that third parties were generally aware that PCT was a merchant in the business of selling other people's property on consignment."

Mingtel relies on two opinions from a sister court to support its argument that Article 9 does not apply. In *Tri-State Chemicals, Inc. v. First State Bank, Stratford*, 185 S.W.3d 519, 520 (Tex. App.—Amarillo 2005, no pet.), the more recent of the two cases, Tri-State entered into a consignment agreement with Panhandle Agri-Tech, Inc. Panhandle then sought a small business loan from First State Bank. *Id.* at 521. "Prior to its approval of the loan, [the] Bank was provided a copy of the consignment agreement between Tri-State and Panhandle and even participated in negotiations regarding the terms of this consignment agreement." *Id.* The Bank perfected a security interest in Panhandle's "inventory, equipment, accounts or contract rights, and cash or non-cash proceeds thereof," but its financing statement did not specifically address proceeds from the sale of the consigned goods. *Id.*

Two years later, when "experiencing severe financial difficulties," Panhandle began commingling payments made on accounts created by the sale of Tri-State's consigned goods with its own resources. *Id.* "Although in dire financial circumstances, of which [the] Bank was aware, Panhandle paid off the loan." *Id.* Contending that the loan payments came at least in part from payments made on open accounts owned by Tri-State, Tri-State sued the bank alleging a claim for money had and received, among other claims. *Id.*

The bank sought summary judgment, arguing that it had a superior right to the proceeds from the open accounts under former UCC section 2.326. *See id.* at 521–22. The bank's right to summary judgment turned on "whether Panhandle's creditors

–11–

generally knew that Panhandle was substantially engaged in selling the goods of others" under former UCC section 2.326(c).[5] *Id.* at 524. The trial court granted the bank's motion, but the court of appeals reversed, concluding that a genuine issue of material fact existed on this question. *See id.* at 523–24. Similarly, in the older of the two cases, the court construed the UCC's pre-1999 consignment provisions and held that fact issues existed precluding summary judgment on the plaintiff's claim for money had and received. *Tri-State Chems., Inc. v. Western Organics, Inc.*, 83 S.W.3d 189, 196–98, 196 n.4 (Tex. App.—Amarillo 2002, pet. denied) (concluding that former Article 9 did not apply, but noting that its analysis was restricted to Article 9 as it existed "prior to the legislative changes of 1999").[6]

Here, however, even assuming an identical inquiry controls the application of current UCC sections 9.102(a)(20) and 9.319,[7] the trial court resolved all material fact questions at the trial on the merits after hearing each party's evidence. We

---

[5] UCC section 2.326 no longer addresses consignments. The current comment 4 to section 2.326 explains that "[c]ertain true consignment transactions were dealt with in former Sections 2-326(3) and 9-114. These provisions have been deleted and have been replaced by new provisions in Article 9. *See, e.g.*, Sections 9-109(a)(4); 9-103(b); 9-319." TEX. BUS. & COM. CODE § 2.326 cmt. 4. These changes were made as part of a comprehensive revision of UCC Article 9 in 1999. All of the states, including Texas, enacted the 1999 revisions. *See* 4 White, Summers, & Hillman, UNIFORM COMMERCIAL CODE § 30:1 (6th ed. 2010); Act of May 12, 1999, 76th Leg., R.S., ch. 414, §1.01, 1999 Tex. Gen. Laws 2639–2750.

[6] Among the issues in *Western Organics* were whether the contract at issue created a "true consignment" or was "a mere security agreement," and whether a purchaser of the consignee's business had the same priority as a creditor of the consignee. *See Western Organics*, 83 S.W.3d at 196–98. Neither issue is presented here. Comerica did not purchase PCT's business, and under the 1999 revisions to the UCC, section 1-201(b)(35) now defines "security interest" to include "any interest of a consignor." *See* TEX. BUS. & COM. CODE § 9.319 cmt. 2, Example 1 (quoted in full above).

[7] Comment 2 to current section 9.319 provides in part, "Insofar as creditors of the consignee are concerned, this Article to a considerable extent reformulates the former law, which appeared in former Sections 2-326 and 9-114, without changing the results." TEX. BUS. & COM. CODE ANN. § 9.319 cmt. 2.

conclude there was legally and factually sufficient evidence to support the trial court's implied finding and conclusion that PCT was "not generally known by its creditors to be substantially engaged in selling the goods of others," and consequently, that Article 9 applied in determining Comerica's rights as PCT's creditor and Mingtel's rights as consignor.[8] *See* TEX. BUS. & COM. CODE § 9.102(a)(20)(A)(iii); *Hazzani, LLC*, 2019 WL 3244175, at *4. Because Mingtel did not have a perfected security interest in the consigned goods, Comerica's perfected security interest in PCT's accounts took priority. *See* TEX. BUS. & COM. CODE § 9.319.[9]

## 2. Money had and received

Mingtel argues that regardless of Article 9's applicability, the equities lie in its favor on its claim for money had and received.[10] To prove this claim, Mingtel must show that Comerica "holds money which in equity and good conscience belongs to" Mingtel. *See Edwards*, 252 S.W.3d at 837. The claim "belongs

---

[8] Given this conclusion, we need not consider Comerica's alternative argument that Mingtel failed to offer evidence that the HSN checks Mingtel relies on were actually payments for the tablets.

[9] Mingtel argues in the alternative that the "consumer goods" exception of section 9.102(a)(20)(C) applies because the tablets it manufactures "are sold primarily to individual purchasers, for person, family, or household use." Under this provision, Mingtel's delivery of the tablets to PCT would not constitute a consignment under Article 9. *See* TEX. BUS. & COM. CODE § 9.102(a)(20)(C). Comerica responds that the tablets delivered by Mingtel to PCT were "inventory" as defined in UCC section 9.102(a)(48)(B), that is, "goods, other than farm products, that . . . are held by a person for sale or lease or to be furnished under a contract of service," not "consumer goods." *See* U.C.C. § 9.102 cmt. 4.a (Article 9's four types of collateral—"consumer goods," "equipment," "farm products," and "inventory"—are "mutually exclusive"). We conclude the "consumer goods" exception does not apply here, *see id.*, and in any event, Mingtel did not raise this argument in the trial court. *See Mansions in the Forest, L.P. v. Montgomery Cty.*, 365 S.W.3d 314, 317 (Tex. 2012) (per curiam) (complaint must be preserved for appellate review).

[10] We assume without deciding that our conclusions regarding Article 9's application do not preclude consideration of Mingtel's claim for money had and received.

conceptually to the doctrine of unjust enrichment." *Id.* (internal quotation omitted).

As we explained in *Edwards*:

> The doctrine of unjust enrichment applies the principles of restitution to disputes that are not governed by a contract between the parties. It characterizes the result of a failure to make restitution under circumstances that give rise to an implied or quasi-contractual obligation to return those benefits.

*Id.* (internal citations and quotations omitted).

In *Edwards*, we discussed the "general principles" governing these equitable doctrines. *See id.* We explained that "courts have stated that a claim for money had and received seeks to restore money where equity and good conscience require restitution; it is not premised on wrongdoing, but seeks to determine to which party, in equity, justice, and law, the money belongs; and it seeks to prevent unconscionable loss to the payor and unjust enrichment to the payee." *Id.* In sum, "a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which belongs to the plaintiff." *Id.* (citations and internal quotations omitted). A defendant may present any facts or raise any defenses that would deny a claimant's right to recover under this theory. *Id.*

Mingtel argues that as between "two innocent parties," Comerica should suffer the loss because it "created the situation and was in the best position to have avoided it." Comerica disagrees, contending that Mingtel was in the best position to

–14–

have avoided the loss by (1) following the actual payment terms under the contracts with HSN and PCT; (2) requesting that PCT hold the money it received for Mingtel's products in trust; or (3) providing specific measures for PCT to segregate funds and put third parties on notice of Mingtel's interest. Comerica argues that because it had no knowledge of the FSA, it could not have remedied Mingtel's loss.

At the trial's conclusion, the trial court took the case under advisement, but commented, "And I would still—I'll just say this. I think this is a tough call. The farther I get into it, the tougher the call is. I think that the equities kind of balance in both ways. I think that Mingtel could have easily protected themselves. But I also think this was probably Mingtel's money initially." Because there was legally and factually sufficient evidence to support the conclusion that Mingtel was in the best position to have avoided the loss, we conclude the trial court's ruling against Mingtel on its claim for money had and received was not "arbitrary, unreasonable, [or] unsupported by guiding rules and principles." *See Edwards*, 252 S.W.3d at 836.

We decide Mingtel's sole issue against it.

## CONCLUSION

The trial court's judgment is affirmed.

/Leslie Osborne//

LESLIE OSBORNE

JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MINGTEL INC. D/B/A AZPEN INNOVATION, Appellant

No. 05-20-01115-CV     V.

COMERICA BANK, Appellee

On Appeal from the 68th Judicial District Court, Dallas County, Texas Trial Court Cause No. DC-19-11481. Opinion delivered by Justice Osborne. Justices Myers and Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee Comerica Bank recover its costs of this appeal from appellant Mingtel Inc. d/b/a Azpen Innovation.


Judgment entered this 2nd day of August, 2022.