02-11-092-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00092-CV

 

 


 
 
 H.E.B., L.L.C.
 
 
  
 
 
 APPELLANT
 AND APPELLEE
 
 
 
 
  
 V.
  
 
 
 
 
 Horace T. Ardinger, Jr.
 and Westland Capitol Inc.
 
 
  
 
 
 APPELLEES
 AND APPELLANTS
 
 


 

 

----------

FROM THE 141st
District Court OF Tarrant COUNTY

----------

OPINION

----------

I.  Introduction

          Appellant
and Cross-Appellee H.E.B., L.L.C. appeals the final judgment awarding Appellee
and Cross-Appellant Horace T. Ardinger, Jr. $1,300,405.04.  Ardinger appeals
the trial court’s denial of his requests for declaratory relief and for attorneys’
fees.  We will affirm the trial court’s judgment in its entirety.

II.  Factual and Procedural Background

          A.      H.E.B.,
Curtis Somoza, and Envoii Technologies, LLC

          H.E.B.
is a limited liability company that was formed in 1997.  Its original members
included Scott Haire, Steve Evans, and Frank Barker.[1]
 Haire has been H.E.B.’s managing member since 1997.  He owned 98% of H.E.B. at
its formation but only 60% at the time of trial.  Haire explained that H.E.B.
primarily “manages different businesses” and “invests in distressed companies.”

          In
May 2003, Envoii Healthcare, LLC, an entity owned and controlled by H.E.B.,
acquired certain technology assets from the bankruptcy estate of Envoii, Inc.,
a company developed by Michael Tolson in the 1990s.  Shortly thereafter, Envoii
Healthcare sold most of those assets—the Envoii platform; five patents; and several
licensed applications, including a payment processing application, a Fujitsu
application, and the “disappearing email” application—to Envoii Technologies,
LLC, an entity formed and wholly owned by H.E.B. to acquire and hold the Envoii
technology.[2]

          The
Envoii platform was not yet “commercially usable” when Envoii Technologies
acquired it in the summer of 2003.[3]  Haire realized that he
needed to raise capital to get the Envoii platform “up and running,” and it was
in this context that he was introduced to Curtis Somoza in August 2003.  Haire
met with Somoza on two separate occasions to discuss the Envoii platform—once
in Florida and once at Somoza’s 27,000-square-foot house in California.  Somoza
claimed to be a “bond trader” and expressed interest in the “disappearing
email” application.  Haire came away from his meetings with Somoza with the
impression that he was very wealthy and had been successful in his business
ventures.

          On
October 1, 2003, Envoii Technologies and the Curtis D. Somoza Living Trust[4]
entered into a subscription agreement whereby the Somoza Trust agreed to pay Envoii
Technologies $1 million in exchange for a 25% membership interest in Envoii
Technologies.[5]  The Somoza Trust paid
Envoii Technologies $550,000 on October 2, 2003, and agreed to pay the
remainder of the funds pursuant to two notes.  The $550,000 paid on October 2,
2003, was the only money paid to Envoii Technologies under the subscription
agreement.

          Interested
in acquiring control of Envoii Technologies, Somoza approached Haire not long after
entering into the October 2003 subscription agreement and inquired about
purchasing a greater interest in Envoii Technologies.  In December 2003, the
Somoza Trust agreed to pay H.E.B. $9 million in exchange for a 45% equity
interest in Envoii Technologies.  Under this letter agreement, the Somoza trust
paid H.E.B. $100,000 and H.E.B. credited the Somoza Trust with a prior license payment
of $250,000, totaling payments in the amount of $350,000 towards the 45%
interest.  The letter agreement also called for the Somoza Trust to pay H.E.B. $650,000
upon the execution of a formal purchase agreement.  Haire executed a formal
purchase agreement on behalf of H.E.B. on January 28, 2004, which acknowledged
the prior payments totaling $350,000 and also required the payment of $650,000
upon its execution, but Haire rescinded his signature because the Somoza Trust
paid H.E.B. only $500,000 of the required $650,000.  The formal purchase
agreement thus fell apart, and Haire traveled to California to “throw Somoza
out of Envoii Technologies.”

          But
Somoza and Haire renegotiated, and H.E.B. and the Somoza Trust entered into a
February 9, 2004 letter agreement whereby the Somoza Trust agreed to purchase
not just a 45% interest in Envoii Technologies, but the remaining 75% interest
held by H.E.B. (70%) and Tolson (5%).  On March 8, 2004, H.E.B. (by Haire) and
Digitally Secured Communications, Inc.[6] (DSC) (by Somoza) formalized
the February letter agreement by executing an “Agreement and Closing Memorandum
for Purchase of Membership Interests” (the March 2004 purchase agreement).[7]
 The March 2004 purchase agreement acknowledged that H.E.B. had received
“Initial Payments” “from [DSC]” totaling $850,000 (the $350,000 plus the $500,000
paid by the Somoza Trust under the prior agreements that had fallen through),
and it credited DSC with that amount towards the purchase price.  In addition
to future payments, the March 2004 purchase agreement required DSC to pay to
H.E.B. $1,300,405.04 at closing.[8]  H.E.B. was paid that
amount, but not by DSC; Persistence Capital LLC, an entity used by Somoza to
funnel monies stolen from investors, directed the payment to H.E.B. out of its
escrow account.[9]  DSC consequently
acquired the remaining 75% interest in Envoii Technologies and, thus, control
of the company.[10]  H.E.B. spent the
$1,300,405.04.

          In
September 2004, H.E.B. sued Somoza, the Somoza Trust, and DSC in California
state court after DSC failed to make the next payment due under the March 2004
purchase agreement—$1,250,000 on August 2, 2004.  In November 2004, H.E.B. placed
DSC into involuntary bankruptcy in California.  H.E.B. and DSC (through Somoza)
attempted to negotiate a resolution to both actions, entering into and
proposing numerous settlement agreements between February 2005 and mid-2006,
but all fell through.

          On
May 16, 2006, the FBI issued an announcement stating that Somoza had been
arrested on charges that he and Robert Coberly, Jr. had “defrauded dozens of
victims out of more than $68 million through an investment scheme.”  According
to a criminal complaint, Somoza had allegedly “orchestrated a Ponzi scheme” in
which he solicited individuals to invest in Persistence Capital, which was
supposed to use the funds to purchase pools of life insurance policies, but
only $4.7 million of the approximately $68 million collected from investors was
used to purchase several pools of life insurance policies.  The other $64
million supported Somoza’s lavish lifestyle.  Somoza was indicted in federal
court on numerous counts, including conspiracy, wire and mail fraud, and
promotional money laundering.[11]

          In
July 2006, H.E.B. filed an adversary complaint in the involuntary bankruptcy
action against DSC for rescission of the March 2004 purchase agreement.  Several
months later, in November 2006, after further negotiations, H.E.B. and DSC
entered into a “Rescission and Settlement Agreement” whereby H.E.B. agreed to
pay DSC $850,000 in exchange for a 75% ownership interest in Envoii
Technologies.  H.E.B. paid the $850,000 and reacquired the 75% ownership
interest in Envoii Technologies, which included “control of the source code and
the patents that were a part of it at the time that [it was] sold.”[12]

          B.      Ardinger,
Somoza, and Litigation

          Interested
in investment opportunities, Ardinger first met Somoza at his California house
in 2003, where they discussed bond trading and insurance.  In July 2003,
Ardinger loaned to or invested with Somoza $5,000,000, based on an expected
return of 5% per month.  Somoza paid Ardinger the expected returns—$250,000 per
month from July to December 2003—but unbeknownst to Ardinger, the funds paid to
him were either his own or came from other bilked “investors.”[13]

          In
October 2003, Ardinger lent Somoza another $5,000,000 to purchase a 90-day CD
to use towards leveraged bond trading.  Ardinger received his expected returns,
but Somoza did not use any of the $5,000,000 for bond trading.[14]

          In
December 2003, Ardinger entered into a joint venture agreement with Persistence
Capital and contributed $5,000,000 towards a supposed investment in pools of
life insurance.  None of the $5,000,000 was used to purchase any pools of life
insurance.

          Soon
thereafter, on March 9, 2004, Ardinger and Somoza (on behalf of the Somoza
Trust and other entities, including Persistence Capital) entered into a “Master
Agreement” whereby Ardinger agreed to contribute $10,000,000 to Westland
Capital, Inc.—a company owned equally by Ardinger and Somoza, of which Ardinger
was supposedly president—to “finance the acquisition of rights in other pools
of life insurance.”[15]  Through Ardinger
Business Development, Inc., an entity controlled by Ardinger and used for
business investments, Ardinger caused $10,000,000 to be transferred into
Westland’s bank account on March 11, 2004.  That same day, without
authorization from Ardinger or Westland’s board of directors, Somoza
transferred $10,000,000 from Westland’s bank account to a Persistence Capital
escrow account.  The next day, on March 12, 2004, Somoza transferred $1,300,405.04
of the $10,000,000 from Persistence Capital’s escrow account to H.E.B.’s
account as a payment pursuant to the March 2004 purchase agreement between
H.E.B. and DSC.

          By
mid-2005, the FBI had begun to investigate Somoza.  Ardinger spoke to the FBI
on several occasions and learned that Somoza had used much of Ardinger’s
investment monies to fund Somoza’s extravagant lifestyle.[16] 
Ardinger conducted his own investigation and attempted to recover some of the
stolen monies.  Lance Ouellette, Ardinger’s stepson, who began working with
Ardinger in 2001 and was involved in various aspects of Ardinger’s companies, recalled
that it was not until June or July 2007 that he learned about the $1,300,405.04
paid to H.E.B. from the Persistence Capital escrow account.[17]

          In
November 2007, Ardinger sued the trustee of the Persistence Capital bankruptcy
proceeding and obtained an order declaring that title to the $1,300,405.04 that
Somoza caused to be transferred from the Persistence Capital escrow account to
H.E.B. in March 2004 never passed from Ardinger to Persistence Capital.  In
March 2008, Ardinger and Westland sued H.E.B. to recover the $1,300,405.04,
alleging claims for money had and received and unjust enrichment, among others.[18] 
After a bench trial, the trial court found that “[i]n equity and good
conscience, HEB should be required to return [$1,300,405.04] to Mr. Ardinger,
the lawful owner of these funds.”  The trial court entered numerous other
findings of fact and conclusions of law, many of which are challenged by H.E.B.
on appeal, and declined to award Ardinger declaratory relief and attorneys’
fees.  H.E.B. and Ardinger appeal.

III.  Balancing the Equities—Money-Had-and-Received Issues

          In
what we construe to be its second, third, fourth, and fifth issues, H.E.B. (1) challenges
the trial court’s conclusions of law numbers 3, 4, 9, 13, 24, 25, 31, 34, 37,
38, 39, 40, and 43; (2) argues that the evidence is legally and factually
insufficient to support the trial court’s findings of fact numbers 14, 15, 16,
19, 22, 42, 44, 47, 48, 69, 70, 73, 79, 80, 81, and 82; (3) complains of
Ardinger’s alleged failure to secure findings of fact or conclusions of law to
support his discovery rule defense; and (4) contends that the trial court
abused its discretion by awarding Ardinger judgment on his
money-had-and-received claim.

          A.      Standard
of Review

          A
claim for money had and received is equitable in nature.  Stonebridge Life
Ins. Co. v. Pitts, 236 S.W.3d 201, 203 n.1 (Tex. 2007).  “’[T]he
expediency, necessity, or propriety of equitable relief’ is for the trial
court, and its ruling is reviewed for an abuse of discretion.”  Wagner &
Brown, Ltd. v. Sheppard, 282 S.W.3d 419, 428–29 (Tex. 2008).  But findings
of fact entered in a case tried to the court are reviewable for legal and
factual sufficiency of the evidence to support them by the same standards that
are applied in reviewing evidence supporting a jury=s
answer, while conclusions of law may be reviewed to determine their correctness
based upon the facts.  Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina
v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994); Wood Care Ctrs., Inc. v.
Evangel Temple Assembly of God of Wichita Falls, Tex., 307 S.W.3d 816, 823
(Tex. App.—Fort Worth 2010, pet. denied).  Thus, the traditional standards of
review regarding evidentiary sufficiency overlap the abuse of discretion
standard.  In cases involving overlapping standards of review, Texas courts
have reasoned that a reviewing court must first determine (1) whether the
trial court had sufficient information upon which to exercise its discretion
and then (2) whether the trial court erred in applying that discretion.  See
Edwards v. Mid-Continent Office Distribs., L.P., 252 S.W.3d 833, 835 n.6, 836
(Tex. App.—Dallas 2008, pet. denied); El Paso Cnty. Hosp. Dist. v. Gilbert,
64 S.W.3d 200, 203–04 (Tex. App.—El Paso 2001, pet. denied).  We apply that
framework in this case.

          We
may sustain a legal sufficiency challenge only when (1) the record
discloses a complete absence of evidence of a vital fact; (2) the court is
barred by rules of law or of evidence from giving weight to the only evidence
offered to prove a vital fact; (3) the evidence offered to prove a vital
fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co. v.
Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S.
1040 (1999); Robert W. Calvert, “No Evidence” and “Insufficient Evidence”
Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).  In determining
whether there is legally sufficient evidence to support the findings under
review, we must consider evidence favorable to the findings if a reasonable
factfinder could and disregard evidence contrary to the findings unless a
reasonable factfinder could not.  Cent. Ready Mix Concrete Co. v. Islas,
228 S.W.3d 649, 651 (Tex. 2007); City of Keller v. Wilson, 168 S.W.3d
802, 807, 827 (Tex. 2005).

          When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the credible
evidence supporting the finding is so weak, or so contrary to the overwhelming
weight of all the evidence, that the answer should be set aside and a new trial
ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986) (op.
on reh’g); Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986); Garza v.
Alviar, 395 S.W.2d 821, 823 (Tex. 1965).

          A
trial court exercises broad discretion in balancing the equities in a case
seeking equitable relief.  Edwards, 252 S.W.3d at 836.  To determine
whether a trial court abused its discretion, we must decide whether the trial
court acted without reference to any guiding rules or principles; in other
words, we must decide whether the act was arbitrary or unreasonable.  Low v.
Henry, 221 S.W.3d 609, 614 (Tex. 2007); Cire v. Cummings, 134
S.W.3d 835, 838–39 (Tex. 2004).  An appellate court cannot conclude that a
trial court abused its discretion merely because the appellate court would have
ruled differently in the same circumstances.  E.I. du Pont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); see also Low,
221 S.W.3d at 620.

          B.      Law

          Money
had and received is an equitable action that may be maintained to prevent
unjust enrichment when one person obtains money which in equity and good
conscience belongs to another.  Staats v. Miller, 150 Tex. 581, 584, 243
S.W.2d 686, 687 (1951); Everett v. TK-Taito, L.L.C., 178 S.W.3d 844, 860
(Tex. App.—Fort Worth 2005, no pet.); Amoco Prod. Co. v. Smith, 946
S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ) (stating that cause of action
for money had and received belongs conceptually to doctrine of unjust
enrichment); see also Edwards, 252 S.W.3d at 837 n.7 (acknowledging that
courts use term “money had and received” interchangeably with other terms for
similar claims, including assumpsit, unjust enrichment, and restitution).  The
action is not based on wrongdoing; rather, it looks only to the justice of the
case and inquires whether the defendant has received money that rightfully
belongs to another.  Amoco, 946 S.W.2d at 164.  As the supreme court has
reasoned,

[A] cause of action
for money had and received is ‘less restricted and fettered by technical rules
and formalities than any other form of action.  It aims at the abstract justice
of the case, and looks solely to the inquiry, whether the defendant holds
money, which . . . belongs to the plaintiff.’

 

Staats,
150 Tex. at 584–85, 243 S.W.2d at 687 (citing U.S. v. Jefferson Elec. Mfg.
Co., 291 U.S. 386, 402, 54 S. Ct. 443, 449 (1934)).

          C.      Consideration
for $1,300,405.04

          In
its second issue, H.E.B. argues that conclusion of law number 3 is legally
erroneous.  Conclusion of law number 3 states,

          3.       A
third party transferee, such as HEB, who receives money from a fraudster (like
Somoza/DSC) but provides no value for the money (sale transaction was rescinded
and voided and stock returned) is in no better position tha[n] the fraudster in
defeating a claim by the rightful owner for recovery of the money wrongfully
obtained.  []

 

In
its third issue, H.E.B. argues that the evidence is legally and factually
insufficient to support the trial court’s findings of fact numbers 69, 70, 73,
and 80, which state,

          69.     The
$850,000 transferred by HEB was the sole consideration and value provided by
HEB for the return of the 75% membership interest in Envoii.  The Rescission
Agreement states that the “consideration” is “therein stated,” and makes no
mention of any refund, credit, or the $1.3M payment by Persistence Capital to
HEB.  The Rescission Agreement also does not reference any damages to the disappearing
email technology or any other software or technology in Envoii’s possession.

 

          70.     HEB
did not return the $1.3M to Somoza, DSC, Persistence Capital or any other
person or entity and did not, after giving effect to the Rescission Agreement,
give any consideration or value in exchange for the 75% membership interest in
Envoii.

 

          73.     In
the fall of 2007, Mr. Ardinger learned that his $1.3M had been transferred
to HEB for no consideration.

 

          80.     On
March 12, 2008, less than eighteen months after the Rescission Agreement was
executed, less than one year after HEB transferred the last part of the
$850,000 to Commercial Escrow Services, Inc. pursuant to the Rescission
Agreement, less than six months after Mr. Ardinger discovered that his
$1.3M had been transferred to HEB for no consideration, and less than one month
after prevailing against Persistence Capital regarding title to Mr. Ardinger’s
$1.3M, Mr. Ardinger and Westland filed the present lawsuit.[[19]]

          H.E.B.
directs us to caselaw addressing post-transfer disputes between strangers over money,
as opposed to a chattel, and contends that courts “are consistent in their
protection of innocent third parties and the free flow of commerce.”  Specifically,
“[o]ne who purchases stolen property from a thief, no matter how innocently,
acquires no title in the property; title remains in the owner.”  Olin Corp.
v. Cargo Carriers, Inc., 673 S.W.2d 211, 216 (Tex. App.—Houston [14th Dist.]
1984, no writ).  Thus, “[t]he general rule is that the owner of stolen property
can recover it or its value from anyone who has received it and exercised
dominion over it.”  Sinclair Houston Fed. Credit Union v. Hendricks, 268
S.W.2d 290, 295 (Tex. Civ. App.—Galveston 1954, writ ref’d n.r.e).  But money
“is an exception to the general rule.  This [is] because of the necessity that
money pass freely in commercial transactions.”  Id.  It is well settled
that legal title to money passes with delivery to a person who acquires it in
good faith and for valuable consideration.  Id.; see Tri-State
Chem., Inc. v. W. Organics, Inc., 83 S.W.3d 189, 195 (Tex.
App.—Amarillo 2002, pet. denied) (reasoning that “as to personalty other
than money, a thief cannot pass good title” (emphasis added)).  H.E.B.
argues that the trial court’s conclusions are inconsistent with this caselaw
because “[t]here was no failure of consideration at the time of the March 2004
Purchase Agreement.”  H.E.B. also challenges the sufficiency of the evidence to
support the trial court’s findings as they relate to the lack of consideration. 
H.E.B.’s arguments miss the mark.

          There
is no dispute that H.E.B. provided consideration to DSC as part of the March
2004 purchase agreement—H.E.B. sold a 75% membership interest in Envoii
Technologies in exchange for (1) “Initial Payments” “from [DSC]” totaling
$850,000 and (2) $1,300,405.04 at closing (and the promise of future
payments).  If this were the extent of the transactional history between H.E.B.
and DSC over the 75% membership interest in Envoii Technologies, then there
would be little doubt that Ardinger would have no right to recover the stolen $1,300,405.04
from H.E.B.  See Tri-State Chem., 83 S.W.3d at 195; Sinclair,
268 S.W.2d at 295.  But something happened in November 2006 that affected
Ardinger’s right to recover the stolen $1,300,405.04:  H.E.B. and DSC agreed to
rescind the March 2004 purchase agreement and settle its disputes.[20]
 Upon rescission, the rights and liabilities of the parties are extinguished;
any consideration paid is returned, together with such further special damage
or expense as may have been reasonably incurred by the party wronged; and the
parties are restored to their respective positions as if no contract had ever
existed.  See Sharabianlou v. Karp, 181 Cal. App. 4th 1133, 1145, 105
Cal Rptr. 3d 300, 310 (2010) (“Rescission extinguishes the contract . . . ,
terminates further liability, and restores the parties to their former
positions by requiring them to return whatever consideration they have
received.”); see also Johnson v. Cherry, 726 S.W.2d 4, 8 (Tex. 1987); Smith
v. Nat’l Resort Cmtys. Inc., 585 S.W.2d 655, 660 (Tex. 1979); Baty v.
ProTech Ins. Agency, 63 S.W.3d 841, 855 (Tex. App.—Houston [14th Dist.]
2001, pet. denied).  Indeed, in conclusion of law number 18, which is
unchallenged, the trial court concluded that “[b]ecause rescission ‘undoes’ the
agreement, any consideration received under the contract must be restored.” 
[Emphasis added.]

          Notwithstanding
the unambiguous terms of the rescission and settlement agreement, which provide
that “DSC agrees to stipulate to judgment for rescission,” Haire agreed at
trial that the rescission and settlement agreement “undid,” “unwound,” and
“made null and void” the March 2004 purchase agreement.  H.E.B. thus reacquired
from DSC the 75% ownership interest in Envoii Technologies, but it returned
only $850,000.  As Haire testified, H.E.B. reacquired the 75% membership interest
in Envoii Technologies and repaid the $850,000 that the March 2004 purchase
agreement credited towards DSC’s purchase of the 75% membership interest in
Envoii Technologies, but H.E.B. kept the $1,300,405.04 that was also paid as
consideration under the terms of the March 2004 purchase agreement.[21]
 Therefore, unless the record demonstrates that H.E.B. agreed to part with some
form of consideration in exchange for retaining the $1,300,405.04 that it was
previously paid for the 75% membership interest in Envoii Technologies, then H.E.B.
retained the $1,300,405.04 for no consideration.  If that is the case, the rule
that legal title to money passes with delivery to a person who acquires it in
good faith and for valuable consideration cannot shelter H.E.B. from
Ardinger’s equitable claim to recover the stolen $1,300,405.04.  See Staats,
150 Tex. at 584–85, 243 S.W.2d at 687 (reasoning that claim for money had and
received “aims at the abstract justice of the case”).

          H.E.B.
argues that the evidence conclusively shows that it gave valuable consideration
for the $1,300,405.04 because (a) H.E.B. and DSC negotiated, and the
bankruptcy court approved, “equitable adjustments to the relative
considerations to be exchanged under” the rescission and settlement agreement;
(b) H.E.B. “paid back” $850,000 toward the $1,300,405.04 in exchange for
the return of the 75% membership interest in Envoii Technologies; and (c) the
rescission and settlement agreement involved a settlement and mutual covenant
of releases between H.E.B. and DSC.

          The
rescission and settlement agreement is governed by and construed in accordance
with California law.  “A settlement agreement is a contract, and the legal
principles which apply to contracts generally apply to settlement contracts.”  Weddington
Prods., Inc. v. Flick, 60 Cal. App. 4th 793, 810, 71 Cal. Rptr. 2d 265, 276
(1998).  California recognizes the objective theory of contracts, under which “[i]t
is the objective intent, as evidenced by the words of the contract, rather than
the subjective intent of one of the parties, that controls interpretation.”  Founding
Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,
109 Cal. App. 4th 944, 956, 135 Cal. Rptr. 2d 505, 514 (2003).

          The
rescission and settlement agreement states that the parties have entered into
it “for the consideration therein stated” and provides that it “contains the
entire understanding between the Parties concerning the subject matter
contained herein.”  It states that “DSC agrees . . . to
transfer its seventy-five (75) percent ownership interest in Envoii Technology,
LLC . . . to HEB to be held in escrow until the Payment
Terms are met.”  The payment terms call for H.E.B. to pay to DSC $850,000 by
March 24, 2007, pursuant to a particular schedule, which H.E.B. did.  Nowhere
in the rescission and settlement agreement does it state that H.E.B. exchanged
anything for the $1,300,405.04.[22]  Thus, the unambiguous terms
of the rescission and settlement agreement do not support H.E.B.’s contentions that
it gave consideration to retain the $1,300,405.04 in the form of “equitable
adjustments” or by “pa[ying] back” $850,000 towards the $1,300,405.04.[23]

          H.E.B.’s
other argument—that the consideration for the $1,300,405.04 involved the mutual
covenant of releases between H.E.B. and DSC—is equally unpersuasive.  The
rescission and settlement agreement indeed provides that each party agrees to
release the other from “any and all claims or causes of any kind relating to
the contractual agreements made the basis of the Lawsuit,” but there is nothing
therein indicating that H.E.B. retained the $1,300,405.04 in exchange for DSC’s
release.  Along the line of mutual releases, the record does demonstrate that on
the same date that the bankruptcy court approved the rescission and settlement
agreement, the court dismissed the involuntary bankruptcy proceeding that
H.E.B. had initiated against DSC.  That was a mutual release as contemplated by
the rescission and settlement agreement.

          H.E.B.
additionally contends that California rescission law, like Texas, takes into
account not just the consideration previously exchanged but also subsequent
damage or injury to the consideration or parties involved and that “[w]hile
Envoii was in the possession and control of Somoza (via DSC), the value of its
technology and patents was diminished due to mismanagement by Somoza and DSC.” 
Thus, according to H.E.B., consideration in the form of damage to the
membership interest accounted for H.E.B.’s retention of the $1,300,405.04.  The
only part of the rescission and settlement agreement that relates to H.E.B.’s
devaluation argument is section 8.01, titled “EXPLANATION OF DELAY IN PROSECUTION
OF PATENT(S),” which provides as follows:

          8.01   The
Parties understand that certain patents identified as part of the March 8,
2004 contract, a listing of which is attached hereto as Exhibit “C” continue to
pend before the United States Patent and Trademark Office (“USPTO”).  Each
Party, upon request of the other or the USPTO, will provide due and adequate
explanation regarding the prior legal proceedings in state and federal
bankruptcy court and the consequent effect of delaying the prosecution of the
patent applications.

This
part of the rescission and settlement agreement merely provides that certain patents
remain pending and that upon request, each party will provide an explanation of
legal proceedings related to the “effect of delaying the prosecution of the
patent applications.”  Section 8.01 is no evidence that H.E.B. retained the
$1,300,405.04 in consideration for damage to the 75% membership interest reacquired
from DSC.

          Contrary
to the terms of the rescission and settlement agreement, Haire testified that
the 75% membership interest reacquired by H.E.B. was “devalued” because Somoza
failed to prosecute the patents involved in the original transaction with
H.E.B. and because licenses were cancelled.  But there was no evidence from any
source of any particular amount of damages attributable to the devaluation of
the 75% membership interest, let alone in the specific amount of
$1,300,405.04.  In other words, H.E.B. did not establish a link between the
“devalued” membership interest that it reacquired and its retention of
$1,300,405.04.  Further, the parol evidence rule prevented the trial court from
giving any legal effect to Haire’s testimony because it either varied or conflicted
with the unambiguous terms of the fully integrated rescission and settlement
agreement.  See Johnson v. Driver, 198 S.W.3d 359, 364 (Tex. App.—Tyler
2006, no pet.) (“The parol evidence rule is not a rule of evidence, but a rule
of substantive law that bars the court from consideration of evidence violative
of the rule, even though it is admitted without objection.”).  To the extent
that H.E.B. argues that it retained $1,300,405.04 on account of its
reacquisition of a “devalued” 75% membership interest in Envoii Technologies,
the record does not support that specific contention.

          We
hold that the trial court did not err by entering conclusion of law number 3
and that the evidence is legally and factually sufficient to support findings
of fact numbers 69, 70, 73, and 80.  We overrule these parts of H.E.B.’s second
and third issues.

          D.      Statute
of Limitations and Accrual

                   1.       Challenged
Conclusions and Findings

          In
its second issue, H.E.B. challenges conclusions of law numbers 38, 39, and 40, arguing
that Ardinger’s claim for money had and received is governed by the two-year
statute of limitations and was time barred.  Those conclusions state,

          38.     Texas
courts, including the Fort Worth Court of Appeals, have held that money had and
received is in the nature of an action for debt and is thereby controlled by
the four-year statute of limitations.  []

 

          39.     An
action for money had and received is a quasi-contractual action, and
contractual actions are governed by a four-year statute of limitations.  []

 

          40.     HEB
cites two cases that supposedly hold that a claim for money had and received is
subject to a two-year statute of limitations, Elledge v. Friberg-Cooper
Water Supply Corp., 240 S.W.3d 869 (Tex. 2007), and Verizon Employee
Benefits Comm. v. Frawley, 655 F.Supp.2d 644 (N.D. Tex. 2008).  Neither
case supports HEB’s proposition.  Elledge dealt with a claim for unjust
enrichment and held only that unjust enrichment claims are governed by a
two-year statute of limitations.  Elledge, 240 S.W.3d at 870.  The Elledge
court does not even discuss the claim for money had and received.  Verizon
dealt with an ERISA claim against an employee for recoupment of overpaid
employee benefits.  The federal court merely compared the ERISA claim to
a claim for money had and received on the basis that it [bore] the most
similarity” to the ERISA claim for recoupment.  Thus, the federal court merely
speculated in dicta as to what it thought Texas law might be,
were it actually considering a claim for money had and received, which it was
not.

H.E.B.
also challenges conclusion of law number 43,[24] which addresses accrual
for purposes of Ardinger’s claim for money had and received and provides,

          43.     Ardinger
had no legal remedy, i.e., no cause of action, against HEB until HEB
executed the Rescission Agreement on November 8, 2006, made final payment
under the Rescission Agreement on March 28, 2007, and was returned the
consideration (the 75% membership interest in Envoii) it had received for
Ardinger’s $1.3M.  []

          H.E.B.
argues that a claim for money had and received is subject to the two-year
statute of limitations because a claim for unjust enrichment, which by
definition includes a cause of action for money had and received, is governed
by the two-year statute of limitations.  See Elledge v. Friberg-Cooper Water
Supply Corp., 240 S.W.3d 869, 870–71 (Tex. 2007).  Regarding accrual, it
argues that a claim for money had and received accrues when money is “had
and received” and that Ardinger’s claim therefore accrued when
H.E.B. “had and received” the stolen $1,300,405.04 in
March 2004.  Ardinger responds that the four-year statute of limitations
applies to a claim for money had and received and that his claim accrued when
H.E.B. executed the rescission and settlement agreement in November 2006 but
retained the $1,300,405.04.

          “A
legal injury must be sustained . . . before a cause of
action arises” for limitations purposes.  Atkins v. Crossland, 417
S.W.2d 150, 153 (Tex. 1967); see S.V. v. R.V., 933 S.W.2d 1, 4
(Tex. 1996) (“As a rule, we have held that a cause of action accrues when a
wrongful act causes some legal injury . . . .”).  Assuming
without deciding that the two-year statute of limitations applies to Ardinger’s
claim for money had and received, his claim was not time barred because he
brought the action against H.E.B. within two years of when it accrued—at
earliest, in November 2006, when H.E.B. executed the rescission and settlement
agreement and was returned the 75% membership interest in Envoii Technologies but
retained the $1,300,405.04 for no consideration.  Ardinger’s claim against
H.E.B. did not accrue before this time because, as alluded to above, H.E.B.
acquired the stolen $1,300,405.04 for consideration (the 75% membership
interest in Envoii Technologies), and until H.E.B. rescinded the March 2004
purchase agreement and retained the $1,300,405.04 for no consideration, H.E.B.
had not committed a wrongful act that caused Ardinger a legal injury.  See Tri-State
Chem., 83 S.W.3d at 195; Sinclair, 268 S.W.2d at 295.  But when
H.E.B. reacquired the 75% membership interest in Envoii Technologies and retained
the $1,300,405.04 for no consideration, Ardinger’s claim accrued because H.E.B.
caused Ardinger legal injury.  See Atkins, 417 S.W.2d at 153; see
also Tri-State Chem., 83 S.W.3d at 195; Sinclair, 268 S.W.2d
at 295.  Accordingly, Ardinger’s March 2008 suit against H.E.B. was not time
barred.

          We
hold that the trial court did not err by entering conclusion of law number 43. 
To the extent that conclusions of law numbers 38, 39, and 40 are erroneous,
they are harmless because we assumed for purposes of our analysis that the
two-year statute of limitations applied to Ardinger’s claim.  See Tex.
R. App. P. 44.1(a); BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d
789, 794 (Tex. 2002) (“If the reviewing court determines a conclusion of law is
erroneous, but the trial court rendered the proper judgment, the erroneous
conclusion of law does not require reversal.”).  We overrule this part of
H.E.B.’s second and third issues.

2.       Lack
of Findings and Conclusions for Discovery Rule Defense

 

          In
what we construe to be its fourth issue, H.E.B. complains of Ardinger’s alleged
failure to secure findings of fact or conclusions of law to support his
discovery rule defense to the two-year statute of limitations.  Above, we
assumed for purposes of our analysis that the two-year statute of limitations
applied to Ardinger’s money-had-and-received claim, and we held that the trial
court did not err by entering conclusion of law number 43—that Ardinger’s
money-had-and-received claim did not accrue until November 2006.  Because
Ardinger filed his claim against H.E.B. in March 2008, his discovery rule
defense is not implicated, and we need not address H.E.B.’s arguments
pertaining to it.  See Tex. R. App. P. 47.1.  We overrule H.E.B.’s fourth
issue.

          E.      Unconscionable
Loss and Unjust Enrichment

          In
its second issue, H.E.B. argues that the trial court erred by entering
conclusions of law numbers 24 and 25,[25] which provide,

          24.     HEB
will be unjustly enriched if not required to restore the $1.3M received as it
provided nothing for these funds.  []

 

          25.     Ardinger
would suffer an unconscionable loss—the $1.3M—if HEB is permitted to keep
Ardinger’s funds.  []

          H.E.B.
contends that Ardinger has no right to the $1,300,405.04 because the funds came
from Westland, not Ardinger.  In finding of fact number 19, however, the trial
court found that Ardinger “contributed $10,000,000 to Westland’s Bank of
America account, via transfer from Ardinger Business Development, Inc.’s JP
Morgan Private Bank account, controlled by Mr. Ardinger.  Mr. Ardinger
later reimbursed Ardinger Business Development, Inc. for these funds.  As
such, the entirety of this $10,000,000 was funded by Mr. Ardinger.”[26] 
[Emphasis added.]  The record also demonstrates that Ardinger sued the trustee
of the Persistence Capital bankruptcy proceeding and obtained an order
declaring that title to the $1,300,405.04 that Somoza caused to be transferred
from the Persistence Capital escrow account to H.E.B. in March 2004 never
passed from Ardinger to Persistence Capital.  The trial court’s conclusion
of law number 77, which is unchallenged, reflects this.

          Citing
several cases that rely on the same proposition, H.E.B. also argues that “equity
dictates that as between two innocent parties, the party that must suffer the
loss is the one who mistakenly created the situation and was in the best
position to have avoided it.”  See Holden Bus. Forms Co. v. Columbia Med.
Ctr. of Arlington Subsidiary, L.P., 83 S.W.3d 274, 278 (Tex. App.—Fort
Worth 2002, no pet.); Lincoln Nat’l Life Ins. Co. v. Brown Schools, Inc.,
757 S.W.2d 411, 413–15 (Tex. App.—Houston [14th Dist.] 1988, no pet.).  This is
an exception to the general rule of restitution that “a party who pays funds
under a mistake of fact may recover restitution of those funds if the party to whom
payment was made has not materially changed his position in reliance thereon.” 
See Bryan v. Citizens Nat’l Bank in Abiline, 628 S.W.2d 761, 763
(Tex. 1982).  The exception in the Holden and Lincoln decisions
is inapposite because Ardinger did not sue H.E.B. to recover money that he
mistakenly paid to H.E.B.  Ardinger sued H.E.B. to recover money that was
stolen by Somoza, a fraudster; used by a Somoza-controlled entity in
furtherance of a separate business agreement and consequently acquired by
another entity, H.E.B.; but then retained by H.E.B. for no consideration after the
underlying agreement that brought the funds to H.E.B. was rescinded.  In no way
does this set of circumstances implicate the exception addressed in Holden
and Lincoln.

          Referencing
its consideration argument, H.E.B. also argues that it was not unjustly
enriched but also “not enriched at all.”  This argument is unpersuasive in
light of our analysis above that H.E.B. retained the $1,300,405.04 for no
consideration.

          We
hold that the trial court did not err by entering conclusions of law numbers 24
and 25.  We overrule this part of H.E.B.’s second and third issues.

          F.       Additional
Challenged Conclusions of Law

 

                   1.       Conclusions
of Law Numbers 4 and 31

          Conclusions
of law numbers 4 and 31 provide,

          4.       The
claim for money had and received allows someone who has funds stolen to recoup
those stolen funds from anyone who received it, even a third party
who received it in good faith for value.  []

 

          31.     “[T]he
unjust enrichment for the purposes of restitution… comes by way of receiving
that which actually belongs to another.  It does not matter that the ultimate
recipient paid value….”  []

H.E.B.
argues that conclusions of law numbers 4 and 31 are erroneous because unlike
with a chattel, one may not recover money from a third party who received it in
good faith and for value.  We agree that the law provides that legal title to
money passes with delivery to a person who acquired it in good faith and for
valuable consideration.  See Tri-State Chem., 83 S.W.3d at 195; Sinclair,
268 S.W.2d at 295.  But it is apparent that conclusions of law numbers 4 and 31
are meant to address the unique facts of the money-had-and-received claim that
are at issue in this case—one in which, using the above lingo, a person (H.E.B.)
acquired “money” ($1,300,405.04 and $850,000) for “valuable consideration” (75%
membership interest in Envoii Technologies) pursuant to an underlying agreement
that was rescinded, but the person (H.E.B.) not only reacquired the
“valuable consideration” (75% membership interest in Envoii Technologies) originally
exchanged but also kept for no consideration part of the “money”
($1,300,405.04) received pursuant to the underlying—but now rescinded—agreement. 
Thus, considered in light of the specific facts of this case, conclusions of
law numbers 4 and 31 are not erroneous.  To the extent that the conclusions are
considered in a vacuum and are erroneous, they are harmless.  See Tex.
R. App. P. 44.1(a); BMC Software, 83 S.W.3d at 794.  We overrule this part
of H.E.B.’s second issue.

                   2.       Conclusions
of Law Numbers 9 and 13

          Conclusions
of law numbers 9 and 13 provide,

          9.       Whether
HEB acquired money in good faith or wrongfully is irrelevant in a claim for
money had and received because the action is not premised on wrongdoing.  []

 

          13.     Whether
money was obtained lawfully by the defendant is likewise irrelevant; an
action for money had and received is proper when the money was obtained
wrongfully from the rightful owner.  []

H.E.B.
argues that conclusions of law numbers 9 and 13 misstate the law of money had
and received because money-had-and-received claims “do, indeed, take into
account issues of good faith/bad faith or lawful/unlawful conduct in balancing
the equities and determining whether money, in equity and good conscience,
belongs to another.”  But the trial court also entered conclusion of law number
26, which is unchallenged, and states that “[t]hough wrongful behavior by the
defendant is not required to hold a defendant liable to restore plaintiff’s
funds, the court may consider lack of innocence in balancing the equities in a
claim for money had and received.”  The trial court also concluded in
conclusion of law number 10, which is unchallenged, that “the sole
inquiry for the court is whether the defendant holds money that in equity and
good conscience belongs to the plaintiff.”  These conclusions indicate that the
trial court did not disregard evidence of H.E.B.’s “good faith/bad faith or
lawful/unlawful” conduct when it balanced the equities and determined whether
the $1,300,405.04, in equity and good conscience, belonged to Ardinger.  At
worst, conclusions of law numbers 9 and 13 are little more than attempts at
referencing the well-established rule that a money-had-and-received claim looks
to the justice of the case and inquires whether the defendant received money
that rightfully belongs to another instead of basing recovery on the
defendant’s wrongdoing.  See Amoco, 946 S.W.2d at 164.  Consequently,
as with conclusions of law numbers 4 and 31, to the extent that conclusions of
law numbers 9 and 31 are considered apart from the trial court’s other
conclusions of law, they are harmless error.  See Tex. R. App. P.
44.1(a); BMC Software, 83 S.W.3d at 794.  We overrule this part of
H.E.B.’s second issue.

                   3.       Conclusion
of Law Number 37

          Conclusion
of law number 37 states,

          37.     It
does not matter that HEB allegedly spent the $1.3M.  []

          H.E.B.
argues that the trial court erred by entering conclusion of law number 37
because H.E.B.’s expenditure of the $1,300,405.04—and alleged detrimental
reliance on DSC’s purported lawful payment—is not irrelevant when addressing
the equities of Ardinger’s money-had-and-received claim.  In Pickett v.
Republic National Bank of Dallas, the supreme court held that the defendant
was liable under a money-had-and-received claim even though it no longer held
the money.  619 S.W.2d 399, 400 (Tex.), cert. denied, 454 U.S. 1125
(1981).  We construe conclusion of law number 37 as an attempt to express this point
of law, not a conclusion that the trial court did not consider detrimental
reliance, if any, by H.E.B. when weighing the equities.[27] 
We overrule this part of H.E.B.’s second issue.

                   4.       Conclusion
of Law Number 34

          Conclusion
of law number 34 provides,

          34.     An
action for conversion can arise even when a defendant acquires property
lawfully.  []

H.E.B.
argues that we should disregard conclusion of law number 34 because it relates
to conversion, a claim rejected by the trial court and not relevant to any
other findings of fact or conclusions of law.  The trial court erred by
entering conclusion of law number 34, but it was harmless because the
conclusion does not relate to Ardinger’s recovery against H.E.B.  See
Tex. R. App. P. 44.1(a); BMC Software, 83 S.W.3d at 794.  We overrule the
remainder of H.E.B.’s second issue.

          G.      Additional
Challenged Findings of Fact

                   1.       Finding
of Fact Number 14

          Finding
of fact number 14 provides as follows:

          14.     In
March 2004, Somoza completed his review of the accounting provided to him
regarding the $720,000 paid to Envoii and HEB from the Somoza Trust, and raised
several objections regarding the propriety of payments made by HEB.  One of the
disputed payments concerned a $15,000 fee paid to HEB’s attorney, Henry Simon,
for introducing Somoza to HEB.  The parties negotiated further and agreed on
March 8, 2004 at a meeting in Los Angeles, California that the transaction
would continue but that Somoza would be given a $349,594.96 price reduction as
full satisfaction of Somoza’s objections regarding the accounting for the
$720,000, and the parties agreed to a new Membership Interest Purchase
Agreement (the “Purchase Agreement”) between HEB and Somoza’s company,
Digitally Secured Communications, Inc. (“DSC”).  The Purchase Agreement
called for HEB (and one of its employees) to be paid between $5 million and $8
million for the remaining 75% membership interest in Envoii, including a credit
in the amount of $850,000 for the amounts previously paid by the Somoza Trust
to HEB and $1,300,405.04 to be paid to HEB (the “$1.3M”) at the execution of
the Purchase Agreement.  The next payment of $1,250,000 was due to HEB on
August 2, 2004.  DSC failed to make that payment or any other payment due under
the Purchase Agreement.

[Emphasis
added.]  H.E.B. argues that the finding “suggests” that it was involved in the
decision to substitute DSC for the Somoza Trust as the “Buyer” but that the
evidence actually shows that Somoza substituted DSC as the “Buyer” in the final
hours preceding the March 2004 purchase agreement’s execution.  Notwithstanding
that we fail to see the significance of H.E.B.’s challenge to finding of fact
number 14, the record is undisputed that Somoza’s substitution of DSC as the
purchaser was a “last-minute change made by Somoza.”  Neither finding of fact
number 14 nor the record contains any suggestion that H.E.B. had anything to do
with Somoza’s decision to substitute DSC for the Somoza Trust.  Finding of fact
number 14 merely sets out some of the circumstances surrounding H.E.B. and DSC’s
entering into the March 2004 purchase agreement.  The evidence is legally and
factually sufficient to support finding of fact number 14.  We overrule this
part of H.E.B.’s third issue.

                   2.       Finding
of Fact Number 15

          Finding
of fact number 15 provides as follows:

          15.     Less
than 24 hours prior to the execution of the Purchase Agreement, Somoza
substituted a new company, DSC, as the purchaser.  At the time, Somoza
represented to HEB that DSC already held the 25% ownership interest which had
been held by the Somoza Trust.  Somoza also represented to HEB that he was
the president and sole shareholder of DSC and that DSC would become the manager
of Envoii.

[Emphasis
added.]  H.E.B. argues that the evidence conclusively demonstrates that the
Somoza Trust, not DSC, owned the 25% membership interest in Envoii Technologies
that was purchased in October 2003.  Although the rescission and settlement
agreement reflected that the Somoza Trust continued to own a 25% ownership interest
in Envoii Technologies, Somoza testified in his January 2006 deposition that
DSC owned a 25% membership interest in Envoii Technologies in March 2004
because the Somoza Trust had transferred that interest to DSC.[28]
 Also, the March 2004 purchase agreement, which is between H.E.B. and DSC, states
that the “Sellers and Buyer are the owners and holders of a total of 100% of
the Member’s Interests . . . in Envoii Technologies.”  We
hold that the evidence is legally and factually sufficient to support finding
of fact number 15, and we overrule this part of H.E.B.’s third issue.

                   3.       Finding
of Fact Number 42

          Finding
of fact number 42 provides as follows:

          42.     The
FBI Affidavit did not mention Haire, HEB, Mr. Ardinger’s $1.3M, or any
transactions involving DSC, which highlights the difficulty of discovering the
full extent of Somoza’s fraud.

H.E.B.
argues that the evidence conclusively demonstrates that “the $10,000,000
(source of the $1.3M), as well as the other $15,000,000, for a total of all $25
million, was addressed in the FBI Affidavit and discussed with Ardinger” and,
therefore, “[a]s a matter of common sense, Ardinger’s discussion with the FBI
about the stolen $25 million highlights that Ardinger knew all $25 million had
been stolen, including the $1.3M.”  The stolen $1,300,405.04 was part of the
funds that Ardinger invested with Somoza, but that does not make it a matter of
“common sense” that Ardinger knew that Somoza had taken the $1,300,405.04 and
used it to pay H.E.B.  The FBI affidavit does not mention H.E.B., Haire, DSC,
or the $1,300,405.04.  We hold that the evidence is legally and factually
sufficient to support finding of fact number 42, and we overrule this part of
H.E.B.’s third issue.

                   4.       Findings
of Fact Numbers 44 and 47

          H.E.B.
challenges findings of fact numbers 44 and 47, which provide,

          44.     Henry
Simon spoke to the FBI regarding Somoza’s arrest and knew, or assumed, that
Somoza had funded the $1.3M payment by Persistence Capital to HEB with funds
stolen from Mr. Ardinger.

 

          47.     Mr. Simon,
at the time he sent the above-quoted e-mail on June 19, 2006, had read the FBI
Affidavit, making him certain that Somoza had stolen from Mr. Ardinger the
$1.3M paid by Persistence Capital to HEB.  Neither Mr. Simon, Haire or HEB
ever contacted or informed Mr. Ardinger that HEB had received funds stolen
from Mr. Ardinger.

H.E.B.
argues that the evidence is legally and factually insufficient to support these
findings because they contradict finding of fact number 42.  Specifically, H.E.B.
questions how the trial court could find that Simon knew after reading the FBI
affidavit that Somoza stole the $1,300,405.04 paid to H.E.B. while also finding
that Ardinger did not know about the stolen $1,300,405.04 after reading
the same FBI affidavit.  Simon testified at one point that he did not know that
Somoza stole the $1,300,405.04 from Ardinger.  However, the evidence also shows
that Simon learned that DSC’s $1,300,405.04 payment (through Somoza) under the
March 2004 purchase agreement was made to H.E.B. using the Persistence Capital
escrow account; that by June 2006, Simon had read the FBI affidavit and the May
2006 press release, “all of which reflected Persistence Capital as being the
entity through which the monies had been stolen in connection with the
insurance pool fraud”; and, significantly, that it was possible that someone
had told him in the summer of 2006 that the $1,300,405.04 used to pay H.E.B.
came from Ardinger.  In regard to being told that the $1,300,405.04 came from
Ardinger, Simon testified, “I would think that somebody probably told me that after
the indictment in some way, but I don’t know who.”  As the factfinder, the
trial court was entitled to resolve the conflicts in Simon’s testimony in favor
of Ardinger.  See City of Keller, 168 S.W.3d at 820.  We hold
that the evidence is legally and factually sufficient to support the trial
court’s findings of fact numbers 44 and 47.  We overrule this part of H.E.B.’s
third issue.

                   5.       Finding
of Fact Number 48

          Finding
of fact number 48 states,

          48.     Fearing
a “Mad dog attack” by defrauded investors, HEB did not want to implicate the
Persistence Capital Bankruptcy because it would require notice to other
creditors, including many defrauded insurance pool creditors like Mr. Ardinger.

As
with several other findings, H.E.B. challenges this finding not for what it
specifically states but for what it “suggests.”  H.E.B. argues that the finding
suggests that H.E.B. had a duty to notify DSC’s creditors about the involuntary
proceeding involving DSC and H.E.B. even though they had no such duty under
law.  The record demonstrates that the finding is actually meant to reference a
June 2006 email drafted by Simon in which he told Somoza’s counsel that he was
“fine” with rescinding the March 2004 purchase agreement but “want[ed] to get
all the paperwork done ASAP before we run into a ‘Mad dog’ attack from one or
more of the allegedly defrauded insurance pool creditors” involved in the
Persistence Capital bankruptcy.  The finding is also supported by the following
exchange at trial between Simon and Ardinger’s attorney in which Simon
acknowledged that he was concerned about defrauded insurance pool investors
attempting to recoup losses from whatever source they could, including from
Envoii Technologies’ assets:

          Q.      And
there’s a reference of -- that economics are fine and that you’re
okay with that.  And then the next sentence says, quote, “I do, however, want
to get all the paperwork done asap before we run into a mad dog attack from one
or more of the allegedly defrauded insurance pool creditors,” end of quote.  Do
you see that?

 

                   A.      I
do.

                             . . .

          Q.      Did
you believe at that particular time that H.E.B. needed to get a deal done very
quickly because of the potential risk associated with the defrauded insurance
pool creditors looking to be paid from whatever source they could find?

 

          A.      Yes,
I thought they were the -- what I had been told or what I called the
defrauded insurance pool creditors were people that had given Somoza money
believing he was making investments for them, which he did not, and they were -- they
were very angry.  Conroy told me how angry they were, and it seemed very likely
to me that if they got wind of the transaction with Digitally Secured
Communications they would intervene.

 

          Q.      And
they would do anything they could to make sure that any consideration that was
going to Mr. Somoza or under his control would be directed to them, right?

 

          A.      I
might say in the event -- they didn’t do that, but that was what my
fear was, yes.

We
overrule this part of H.E.B.’s third issue.

                   6.       Findings
of Fact Numbers 16 and 22

          As
with finding of fact number 19, H.E.B. listed findings of fact numbers 16 and
22 in the title of its third issue challenging the legal and factual
sufficiency of the evidence to support the trial court’s findings of fact, but it
provided no argument for those two specific grounds.[29] 
Accordingly, to the extent that H.E.B. challenges the legal and factual
sufficiency of the evidence to support findings of fact numbers 16 and 22,
H.E.B. waived those arguments for appellate review.  See Tex. R. App. P.
38.1(i); Fredonia State Bank, 881 S.W.2d at 284.  We overrule this part
of H.E.B.’s third issue.

          H.      Abuse
of Discretion

          In
what we construe to be its fifth issue, H.E.B. argues that even if we overrule
its challenges to the trial court’s findings and conclusions, as we have done, the
trial court still abused its discretion by awarding judgment in favor of
Ardinger on his money-had-and-received claim.[30]  H.E.B. repeats many, if
not all, of the arguments that we have already addressed—and rejected—in
reviewing the trial court’s findings and conclusions.

          We
have reviewed the entire record that the trial court considered in weighing the
equities involved in this case.  There is evidence that supports Ardinger’s claim
for money had and received and evidence that does not support Ardinger’s
claim.  But in balancing all of the equities of the case, there is one piece of
evidence that the trial court reasonably could have assigned considerable
weight in favor of Ardinger:  H.E.B. rescinded the March 2004 purchase
agreement but kept the $1,300,405.04 instead of returning it to DSC, which
unchallenged conclusion of law number 18 indicates was required of H.E.B.  An
abuse of discretion does not occur when the trial court bases its decisions on
conflicting evidence and some evidence of substantive and probative character
supports its decision.  Unifund CCR Partners v. Villa, 299 S.W.3d 92, 97
(Tex. 2009); Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002). 
That is precisely the case here.  Accordingly, we hold that the trial court neither
acted without reference to any guiding rules or principles, nor acted arbitrarily
or unreasonably—and therefore did not abuse its discretion—by awarding judgment
for Ardinger on his claim for money had and received.  See Low,
221 S.W.3d at 614; Staats, 150 Tex. at 584, 243 S.W.2d at 687.  We
overrule H.E.B.’s fifth issue and the remainder of its third issue.

IV. 
Collateral Attack

          In
what we construe to be H.E.B.’s first issue, it argues that the trial court
erred by allowing Ardinger to collaterally attack the DSC bankruptcy court
order approving the rescission and settlement agreement between H.E.B. and DSC.

          A
collateral attack is an attempt to avoid the binding force of a judgment in a
proceeding not instituted for that purpose, but in order to obtain some
specific relief against which the judgment currently stands as a bar.  Sweetwater
Austin Props., L.L.C. v. SOS Alliance, Inc., 299 S.W.3d 879, 885 (Tex.
App.—Austin 2009, pet. denied).  Collateral attacks on final judgments are
generally disallowed because it is the policy of the law to give finality to
the judgments of the courts.  Browning v. Prostok, 165 S.W.3d 336, 345
(Tex. 2005).

          Ardinger’s
claim against H.E.B. for money had and received is not an impermissible collateral
attack on the DSC bankruptcy court order because Ardinger did not attempt to
avoid or alter the binding force of the bankruptcy court order.  Instead, Ardinger
sought to recover $1,300,405.04 from H.E.B. because H.E.B. retained those funds
for no consideration after executing the rescission and settlement agreement. 
We overrule H.E.B.’s first issue.

V.  Declaratory Judgment

          In
his first issue, Ardinger argues that the trial court erred by not granting his
request for declaratory relief.  Ardinger had sought a declaration that his
“rights and interests in the $1,300,405.04 at issue in this case are superior
to the rights of HEB[,] and HEB is without any legal right to retain such
funds.”

          The
supreme court recently clarified that the Uniform Declaratory Judgment Act
(UDJA) is “preventative” in nature—it is generally intended as a means of
determining the parties’ rights when a controversy has arisen but before a
wrong has been committed.  Etan Indus., Inc. v. Lehmann, No. 10-0318,
2011 WL 6276308, at *4 (Tex. Dec. 16, 2011) (citing Cobb v. Harrington,
144 Tex. 360, 367, 190 S.W.2d 709, 713 (1945)); Redwine v. AAA Life Ins. Co.,
852 S.W.2d 10, 17 (Tex. App.—Dallas 1993, no writ) (reasoning that UDJA is not
available to settle disputes already pending before a court); see also
Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West 2008).

          Here,
Ardinger argued throughout trial and in this appeal that he did not suffer a
legal injury at H.E.B.’s hands until H.E.B. executed the rescission and
settlement agreement and retained the $1,300,405.04 for no consideration. 
Having then suffered a legal injury, Ardinger sued H.E.B. in March 2008 to
recover $1,300,405.04 that Ardinger contended, in equity and good conscience,
belonged to him.  Thus, at no point during this litigation has Ardinger sought
declaratory relief to determine his right to the $1,300,405.04 before a wrong had
been committed against him.  Rather, he has essentially sought declaratory
relief to supplement his claim against H.E.B. for money had and received.[31] 
That is not the type of relief that the UDJA is intended to provide.  Accordingly,
we hold that the trial court did not err by denying Ardinger’s claim for
declaratory relief, and we overrule Ardinger’s first issue.

VI.  Attorneys’ Fees

          A.      Ardinger’s
Attorneys’ Fees

          In part of his second issue,
Ardinger argues that the trial court abused its discretion by not awarding him
reasonable and necessary attorneys’ fees pursuant to his requested declaratory
relief.  Having determined that the trial court did not err by denying
Ardinger’s request for declaratory relief, we hold that the trial court did not
abuse its discretion by declining to award Ardinger attorneys’ fees pursuant to
his requested declaratory relief.  See Tex. Civ. Prac. & Rem. Code
Ann. § 37.009 (West 2008) (providing that trial court may award reasonable
and necessary attorneys’ fees “as are equitable and just”).

          In
the other part of his second issue, Ardinger argues that the trial court abused
its discretion by not awarding him attorneys’ fees for prevailing on his claim
for money had and received.  Texas law does not allow recovery of attorneys’
fees unless authorized by statute or contract.  Tony Gullo Motors I,
L.P. v. Chapa, 212 S.W.3d 299, 310 (Tex. 2006).  Ardinger does not argue
that his claim for money had and received is either a statutory or a contract
action.  The only support that Ardinger cites for this issue is Amoco.  See
946 S.W.2d at 166.  In that case involving a money-had-and-received claim, the
appellate court reasoned that “[a]n award of attorney’s fees in such a case may
under some circumstances be appropriate, but we find it to be within the
discretion of the trial court.”  Id.

          We
do not have to decide today whether a party may recover attorneys’ fees on a claim
for money had and received because even assuming that a trial court may award
attorneys’ fees on that claim, the trial court here nonetheless did not abuse
its discretion.  In Amoco, the appellate court held that the trial court
did not abuse its direction by refusing to award attorneys’ fees because “the
overpayment to appellees was due to Amoco’s own error rather than a breach or
any wrongdoing on the part of appellees.”  Id.  Similarly, along those
equity lines, in this case, the trial court could have reasonably considered several
of the equities that weighed in favor of H.E.B.—including that Ardinger had
invested $25,000,000 with Somoza by March 2004 and had concerns about his
investments around that same time but did not check Westland’s bank records for
over a year—and declined to award Ardinger attorneys’ fees.  Accordingly, assuming
without deciding that the trial court could award attorneys’ fees, we hold that
the trial court did not abuse its discretion by denying Ardinger’s request for
attorneys’ fees pursuant to his claim for money had and received.  We overrule
the remainder of Ardinger’s second issue.

          B.      H.E.B.’s
Attorneys’ Fees

          In
what we construe to be its sixth issue, H.E.B. argues that the trial court
abused its discretion by not awarding H.E.B. attorneys’ fees because Ardinger
did not prevail on his claim for declaratory relief.  The UDJA does not require
an award of attorneys’ fees to the prevailing party; rather, the statue
“affords the trial court a measure of discretion in deciding whether to award
attorney fees or not.”  Bocquet v. Herring, 972 S.W.2d 19, 20 (Tex.
1998).  Considering that Ardinger merely sought declaratory relief to
supplement his claim against H.E.B. for money had and received, the primary
claim pursued by Ardinger, we hold that the trial court could have reasonably
determined that it would not have been equitable and just to award H.E.B.
reasonable and necessary attorneys’ fees as the prevailing party on the
declaratory relief action.  See Tex. Civ. Prac. & Rem. Code Ann. § 37.009. 
We overrule H.E.B.’s sixth issue.

VII.  Conclusion

          Having
overruled all of H.E.B.’s issues, we affirm the trial court’s judgment awarding
Ardinger $1,300,405.04.  Having overruled Ardinger’s cross-issues, we affirm
the trial court’s judgment declining to award Ardinger declaratory relief and
attorneys’ fees.

 

 

BILL MEIER
JUSTICE

 

PANEL: 
WALKER,
MEIER, and GABRIEL, JJ.

 

DELIVERED:  March 22, 2012









[1]Hence the abbreviation
“H.E.B.”





[2]According to Haire, when
H.E.B. bought the Envoii platform and the “disappearing email” application, the
goal of the technology was “[t]o be able to send an email with encrypted data
in it so that you could erase the email if you chose to later on.”





[3]Envoii Healthcare hired
Tolson to continue developing the technology.





[4]Somoza created the Somoza
Trust in October 2002 to receive and manage assets for the benefit of Somoza
during his lifetime.





[5]The Somoza Trust also
agreed to pay Envoii Technologies $50,000 in exchange for the license to
develop the “disappearing email” technology.





[6]Somoza formed DSC to make
this acquisition, and he substituted DSC as the purchaser at the “last
minute.”  Haire had never heard of DSC.





[7]Although the parties
sometimes referred to H.E.B. as owning 70% of Envoii Technologies, the March
2004 purchase agreement reflects that H.E.B. owned 45% of Envoii Technologies
and SAH, LLC, an entity of which Haire was the “sole manager member,” owned 25%
of Envoii Technologies.  Tolson also agreed to sell his 5% interest in Envoii
Technologies.





[8]The total amount to be
paid to H.E.B. for the 75% membership interest in Envoii Technologies ranged
from $5 million to $8 million.





[9]Persistence Capital filed
for bankruptcy in California in September 2005.





[10]H.E.B. did not negotiate
for a lien on the Envoii Technology membership interests transferred, nor did
it condition the transfer of the interests on payments by DSC (or some other
Somoza-controlled entity).





[11]The Securities and
Exchange Commission had previously settled a suit with Somoza and Coberly
involving allegations that they had cheated investors out of approximately $6.7
million as part of a prime note fraud.





[12]H.E.B. subsequently
entered into an agreement with the Persistence Capital bankruptcy trustee to
acquire the remaining 25% interest.





[13]Somoza did not invest any
of the $5,000,000 in bonds.  He used approximately $4,800,000 of the funds to
settle with investors involved in the prime note scheme.





[14]Ardinger claimed that at
this point, he had no reason to suspect that Somoza was lying to him; Ardinger
had received the expected returns on his investments, but he did not realize
that the returns were his own money.





[15]The Master Agreement
provided, “No funds shall be transferred from Westland without the written
approval of the President and a majority of the Board of Directors.”  Ardinger,
Somoza, and Coberly were on its board of directors.





[16]Ardinger told the FBI
that he had received a return of approximately $3,375,000 on his principal
investments of $25,000,000 with Somoza.  He also confirmed “that it was never
his intent that any of his investment monies be used for any purpose other than
bond trading or the purchase of insurance policies.”





[17]Ardinger’s lawyers
located H.E.B.’s California lawsuit against DSC and Somoza in November 2005. 
But Ouellette testified at trial that the complaint did not put him on notice
that the $1,300,405.04 had been stolen from Ardinger.





[18]Ardinger and Westland
also sued—and obtained a default judgment against—DSC and Somoza, in his
individual capacity and as trustee of the Somoza Trust.





[19]As to finding of fact
number 80, H.E.B. only challenges the portion that states that
“Mr. Ardinger discovered that his $1.3M had been transferred to HEB for no
consideration.”





[20]In H.E.B.’s “Complaint
for Rescission of Contract,” H.E.B. prayed “[f]or an Order of Rescission,
declaring that the [March 2004 purchase agreement] is, as declared by this
Court, null and void, ab initio, effective as of and from March 8, 2004,
and that as a result thereof, the Sellers remain and are the owners and holders
of 75% of the Members Interest in Envoii Technologies, LLC.”  The bankruptcy
court approved the rescission and settlement agreement.





[21]The March 2004 purchase
agreement stated that the initial payments ($850,000) “are part of [DSC’s]
purchase of the Interests from [H.E.B. and Tolson], in addition to the payments
required by this Agreement.”  Both Haire and Henry Simon, an attorney who has
represented Haire or his companies for years, acknowledged this at trial.





[22]Haire even agreed at
trial that the rescission and settlement agreement does not characterize the
payments as a refund of the $1,300,405.04.





[23]There is also no evidence
that the bankruptcy court “approved” any claimed equitable adjustments to the
considerations exchanged.  The $1,300,405.04 is not mentioned in the rescission
and settlement agreement nor was it addressed at the settlement hearing.  The
only discussion at the settlement hearing of the consideration exchanged was
the following:

THE COURT:   So the payment is basically a return of
consideration.

MR. KUHNER:   It’s a lesser amount --

THE COURT:   Yeah, but in that nature.

MR. KUHNER:   That’s right.

THE COURT:   Okay.  Okay.





[24]In its third issue,
H.E.B. challenges finding of fact number 79, which is duplicative of conclusion
of law number 43.





[25]In its third issue,
H.E.B. challenges finding of fact number 81, which is duplicative of
conclusions of law numbers 24 and 25.





[26]In its brief, H.E.B.
listed finding of fact number 19 in the title of its third issue challenging
the legal and factual sufficiency of the evidence to support the trial court’s
findings of fact, but it provided no argument for that specific ground. 
Accordingly, to the extent that H.E.B. argues the evidence does not support
finding of fact number 19, H.E.B. waived that argument for appellate review.  See
Tex. R. App. P. 38.1(i) (requiring brief to contain clear and concise argument
for the contentions made with appropriate citations to authorities); Fredonia
State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 (Tex. 1994)
(discussing “long-standing rule” that issue may be waived due to inadequate
briefing).





[27]A federal district court
cited Pickett and reasoned, “The fact that [Appellee] no longer
possesses the money is irrelevant.”  Newington Ltd. v. Forrester, No.
3:08-CV-0864-G ECF, 2008 WL 4908200, at *5 (N.D. Tex. Nov. 13, 2008) (mem.
op.).  This could be the source of the language used in conclusion of law
number 37.





[28]This portion of the
deposition excerpt was admitted at trial.





[29]Findings of fact numbers
16 and 22 state,

          16.     The
$1.3M payment under the Purchase Agreement to HEB was not made by DSC; instead,
it was made by Persistence Capital, LLC of which Somoza was a member and
controlled.

 

22.     On March 12, 2004, without written
authorization from or knowledge of Mr. Ardinger (Westland’s President) or
Westland’s board of directors, Somoza transferred $1.3M of Ardinger’s
$10,000,000 from Persistence Capital’s Bank of America escrow account to HEB’s
account at Branch Banking & Trust Company as partial payment under the
Purchase Agreement.





[30]In its third issue,
H.E.B. challenges finding of fact number 82, which states, “In equity and good
conscience, HEB should be required to return $1.3M to Mr. Ardinger, the
lawful owner of these funds.”  H.E.B. directs us to this, its fifth issue, for
its argument under this ground.





[31]Nor did Ardinger seek to
recover under a contract.  See MBM Fin. Corp. v. Woodlands Operating Co.,
L.P., 292 S.W.3d 660, 667 (Tex. 2009) (reasoning that UDJA provides relief
in contract cases before or after there has been a breach).